IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE INVESTORS BANCORP, INC. STOCKHOLDER LITIGATION | § § § § § § § § § | No. 169, 2017<br><br>Court Below – Court of Chancery of the State of Delaware<br><br>C.A. No. 12327-VCS |

Submitted: October 4, 2017
Decided: December 13, 2017
Revised: December 19, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery: **REVERSED** and **REMANDED**.

Steve J. Purcell, Esquire *(Argued)*, Purcell Julie & Lefkowitz LLP, New York, New York; David A. Jenkins, Esquire, Neal C. Belgam, Esquire, and Clarissa R. Chenoweth, Esquire, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, for Plaintiffs-Below, Appellants Robert Elburn and Dieter Soehnel.

Kenneth J. Nachbar, Esquire *(Argued)* and Zi-Xiang Shen, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, for Defendants-Below, Appellees Robert C. Albanese, Dennis M. Bone, Doreen R. Byrnes, Domenick A. Cama, Robert M. Cashill, William V. Cosgrove, Kevin Cummings, Brian D. Dittenhafer, Brendan J. Dugan, James J. Garibaldi, Michele N. Siekerka, and James H. Ward III, and Nominal Defendant-Below, Appellee Investors Bancorp, Inc.

**SEITZ**, Justice:

In this appeal we consider the limits of the stockholder ratification defense when directors make equity awards to themselves under the general parameters of an equity incentive plan. In the absence of stockholder approval, if a stockholder properly challenges equity incentive plan awards the directors grant to themselves, the directors must prove that the awards are entirely fair to the corporation. But, when the stockholders have approved an equity incentive plan, the affirmative defense of stockholder ratification comes into play. Stated generally, stockholder ratification means a majority of fully informed, uncoerced, and disinterested stockholders approved board action, which, if challenged, typically leads to a deferential business judgment standard of review.

For equity incentive plans in which the award terms are fixed and the directors have no discretion how they allocate the awards, the stockholders know exactly what they are being asked to approve. But, other plans—like the equity incentive plan in this appeal—create a pool of equity awards that the directors can later award to themselves in amounts and on terms they decide. The Court of Chancery has recognized a ratification defense for such discretionary plans as long as the plan has "meaningful limits" on the awards directors can make to themselves.[1] If the

---

[1] *Seinfeld v. Slager*, C.A. No. 6462-VCG, 2012 WL 2501105, at *11–12 (Del. Ch. June 29, 2012).

discretionary plan does not contain meaningful limits, the awards, if challenged, are subject to an entire fairness standard of review.

Stockholder ratification serves an important purpose—directors can take self-interested action secure in the knowledge that the stockholders have expressed their approval. But, when directors make discretionary awards to themselves, that discretion must be exercised consistent with their fiduciary duties. Human nature being what it is,[2] self-interested discretionary acts by directors should in an appropriate case be subject to review by the Court of Chancery.

We balance the competing concerns—utility of the ratification defense and the need for judicial scrutiny of certain self-interested discretionary acts by directors—by focusing on the specificity of the acts submitted to the stockholders for approval. When the directors submit their specific compensation decisions for approval by fully informed, uncoerced, and disinterested stockholders, ratification is properly asserted as a defense in support of a motion to dismiss. The same applies for self-executing plans, meaning plans that make awards over time based on fixed criteria, with the specific amounts and terms approved by the stockholders. But, when stockholders have approved an equity incentive plan that gives the directors

---

[2] *Gottlieb v. Heyden Chem. Corp*., 90 A.2d 660, 663 (1952) ("Human nature being what it is, the law, in its wisdom, does not presume that directors will be competent judges of the fair treatment of their company where fairness must be at their own personal expense. In such a situation the burden is upon the directors to prove not only that the transaction was in good faith, but also that its intrinsic fairness will withstand the most searching and objective analysis.").

discretion to grant themselves awards within general parameters, and a stockholder properly alleges that the directors inequitably exercised that discretion, then the ratification defense is unavailable to dismiss the suit, and the directors will be required to prove the fairness of the awards to the corporation.

Here, the Equity Incentive Plan ("EIP") approved by the stockholders left it to the discretion of the directors to allocate up to 30% of all option or restricted stock shares available as awards to themselves. The plaintiffs have alleged facts leading to a pleading stage reasonable inference that the directors breached their fiduciary duties by awarding excessive equity awards to themselves under the EIP. Thus, a stockholder ratification defense is not available to dismiss the case, and the directors must demonstrate the fairness of the awards to the Company. We therefore reverse the Court of Chancery's decision dismissing the complaint and remand for further proceedings consistent with this opinion.

## I.

According to the allegations of the complaint, which we must accept as true at this stage of the proceedings,[3] the plaintiffs are stockholders of Investors Bancorp, Inc. ("Investors Bancorp" or the "Company") and were stockholders at the time of

---

[3] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) ("In deciding a motion to dismiss under Rule 12(b)(6), a trial court must accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor.").

4

the awards challenged in this case. The defendants fall into two groups—ten non-employee director defendants[4] and two executive director defendants.[5] Investors Bancorp, the nominal defendant, is a Delaware corporation with its principal place of business in Short Hills, New Jersey. Investors Bancorp is a holding company for Investors Bank, a New Jersey chartered savings bank with corporate headquarters in Short Hills, New Jersey. The Company operates 143 banking branches in New Jersey and New York. In 2014, after a mutual-to-stock conversion,[6] Investors Bancorp conducted a second-step offering to the public, which is when the plaintiffs acquired their shares. In this second-step offering, the Company sold 219,580,695 shares and raised about $2.15 billion.

The board sets director compensation based on recommendations of the Compensation and Benefits Committee ("Committee"), composed of seven of the ten non-employee directors. In 2014, the non-employee directors were compensated by (i) a monthly cash retainer; (ii) cash awards for attending board and board

---

[4] Robert C. Albanese, Dennis M. Bone, Doreen R. Byrnes, Robert M. Cashill, William V. Cosgrove, Brian D. Dittenhafer, Brendan J. Dugan, James J. Garibaldi, Michele N. Siekerka, and James H. Ward III.

[5] Kevin Cummings, the Company's President and CEO, and Domenick A. Cama, the Company's COO and Senior Executive Vice President.

[6] In May 2014, a mutual-to-stock conversion transformed Investors Bank from a two-tier mutual holding company into a fully public stock holding company. App. to Opening Br. at 29 (Compl., *In re Investors Bancorp, Inc. Stockholder Litig.*, No. 12327-VCS, ¶ 29 (Del. Ch. June 7, 2016)). Through the conversion, MHC, Old Investors Bancorp's parent company, merged into Old Investors Bancorp, which merged into Investors Bancorp—the Company that is the subject of this suit. *Id.* Old Investors Bancorp shares not held by MHC were converted into Investors Bancorp shares, and the common shares of MHC were sold. *Id.*

committee meetings; and (iii) perquisites and personal benefits. The chairman of each committee received an additional annual retainer. As the Court of Chancery noted, the annual compensation for all non-employee directors ranged from $97,200 to $207,005, with $133,340 as the average amount of compensation per director:

| Name | Investors Bancorp Cash Fees | Bank Cash Fees | All Other Compensation | Total |
|------|------|------|------|------|
| Albanese | $56,500 | $73,200 | $343 | $130,043 |
| Bone | $37,500 | $73,200 | $264 | $110,964 |
| Byrnes | $59,500 | $73,200 | $9,898 | $142,598 |
| Cashill | $48,000 | $146,400 | $12,605 | $207,005 |
| Cosgrove | $24,000 | $73,200 | $32,970 | $130,170 |
| Dittenhafer | $59,500 | $73,200 | $13,392 | $146,092 |
| Dugan | $45,000 | $73,200 | - | $118,200 |
| Garibaldi | $24,000 | $73,200 | - | $97,200 |
| Siekerka | $45,000 | $73,200 | $230 | $118,430 |
| Ward | $59,500 | $73,200 | - | $132,700 |
| **Total** | | | | **$1,333,402** |

In 2014, Cummings, the Company's President and CEO, received (i) a $1,000,000 base salary; (ii) an Annual Cash Incentive Award of up to 150% of his base salary contingent on certain performance goals; and (iii) perquisites and benefits valued at $278,400, which totaled $2,778,700. Cama, the Company's COO and Senior Executive Vice President, received annual compensation consisting of (i) a $675,000 base salary; (ii) an Annual Cash Incentive Award of up to 120% of

6

his base salary; and (iii) perquisites and benefits valued at $180,794, which totaled $1,665,794.[7]

At the end of 2014, following completion of the conversion plan, the Committee met to review 2014 director compensation and set compensation for 2015. Gregory Keshishian, a compensation consultant from GK Partners, Inc., presented to the board a study of director compensation for eighteen publicly held peer companies. According to the study, these companies paid their non-employee directors an average of $157,350 in total compensation. The Company's $133,340 average non-employee director compensation in 2014 fell close to the study average. Following the presentation, the Committee recommended to the board that the non-employee director compensation package remain the same for 2015. The only change was to increase the fees paid for attending committee meetings from $1,500 to $2,500.

The Committee also reviewed the compensation package for executive officers. After GK Partners reviewed peer-average figures with the committee, the committee unanimously recommended no changes to Cummings' or Cama's annual salary, but recommended an increase in the 2015 Annual Cash Incentive Award from

---

[7] App. to Opening Br. at 30–34 (Compl. ¶¶ 32–40).

150% to 200%, and 120% to 160% of their base salaries, respectively.[8] The Committee did not discuss any additional equity awards at the December or February meetings.

Just a few months after setting the 2015 board compensation, in March, 2015, the board proposed the 2015 EIP. The EIP was intended to "provide additional incentives for [the Company's] officers, employees and directors to promote [the Company's] growth and performance and to further align their interests with those of [the Company's] stockholders . . . and give [the Company] the flexibility [needed] to continue to attract, motivate and retain highly qualified officers, employees and directors."[9]

The Company reserved 30,881,296 common shares for restricted stock awards, restricted stock units, incentive stock options, and non-qualified stock options for the Company's 1,800 officers, employees, non-employee directors, and service providers. The EIP has limits within each category. Of the total shares, a maximum of 17,646,455 can be issued for stock options or restricted stock awards

---

[8] App. to Opening Br. at 38 (Compl. ¶ 54). The Committee did not define the precise performance metrics that would be used to set the Annual Cash Incentive Award percentage Cummings or Cama would receive, noting only that receiving the full amount would "entail a significant degree of challenge." *Id.* at 39 (Compl. ¶ 57). The metrics were later determined at the February 23, 2015 Committee meeting and included net income, successful conversion of the core operating system, and certain personal goals. *Id.* at 40 (Compl. ¶ 59).

[9] *Id.* at 328 (Investors Bancorp, Inc., Proxy Statement for the 2014 Annual Meeting of Stockholders, at 40 (June 9, 2015) [hereinafter 2014 Proxy])).

and 13,234,841 for restricted stock units or performance shares. Those limits are further broken down for employee and non-employee directors:

- A maximum of 4,411,613 shares, in the aggregate (25% of the shares available for stock option awards), may be issued or delivered to any one employee pursuant to the exercise of stock options;

- A maximum of 3,308,710 shares, in the aggregate (25% of the shares available for restricted stock awards and restricted stock units), may be issued or delivered to any one employee as a restricted stock or restricted stock unit grant; and

- The maximum number of shares that may be issued or delivered to all non-employee directors, in the aggregate, pursuant to the exercise of stock options or grants of restricted stock or restricted stock units shall be 30% of all option or restricted stock shares available for awards, "all of which may be granted in any calendar year."[10]

According to the proxy sent to stockholders, "[t]he number, types and terms of awards to be made pursuant to the [EIP] are subject to the discretion of the Committee and have not been determined at this time, and will not be determined until subsequent to stockholder approval."[11] At the Company's June 9, 2015 annual meeting, 96.25% of the voting shares approved the EIP (79.1% of the total shares outstanding).[12]

---

[10] *In re Investors Bancorp, Inc. Stockholder Litig.*, C.A. No. 12327-VCS, 2017 WL 1277672, at *4 (Del. Ch. Apr. 5, 2017) (quoting App. to Answering Br. at 351 (2014 Proxy, at 72 § 3.3).
[11] App. to Answering Br. at 336 (2014 Proxy, at 46).
[12] *In re Investors Bancorp, Inc. Stockholder Litig.*, 2017 WL 1277672, at *4.

9

Three days after stockholders approved the EIP, the Committee held the first of four meetings and eventually approved awards of restricted stock and stock options to all board members.  According to the complaint, these awards were not part of the final 2015 compensation package nor discussed in any prior meetings.[13]  The first meeting took place on June 12, 2015.  The Committee met with Cummings, Cama, Keshishian (the compensation consultant), and representatives from Luse Gorman (outside counsel) "to begin the process of determining the allocation of shares."[14]

At the second meeting on June 16, 2015, the Committee met with Keshishian, the Luse Gorman representatives, and the full board except Siekerka and Ward, to "gather input" from outside experts and Committee members.[15]  They considered a list of the stock options and awards granted by the 164 companies that underwent mutual-to-stock conversions in the last twenty years.[16]  Luse Gorman presented an analysis of these companies, selected "based on the size of the company and the size of the equity sold in the second step offering, and the size of the equity plan."[17]  The complaint alleges that the first two are arbitrary and the third is "a textbook example

---

[13] App. to Opening Br. at 41, 45–46 (Compl. ¶ 61, 27–29 ¶ 72).
[14] *Id.* at 46 (Compl. ¶ 73).  It is unclear when these meetings were planned; but as of the first meeting, the three future meetings had already been scheduled. *Id.*
[15] *Id.* at 47 (Compl. ¶ 75).
[16] *Id.*
[17] *Id.* at 73 (Compl. ¶ 120).

of results driven by self-selection bias."[18]  The plaintiffs also claim that Luse Gorman did not compare five other companies on the list that met the criteria and had more recently undergone conversions—each of which granted significantly lower awards.[19]

At the third meeting on June 19, 2015, the Committee met with Cummings, Cama, Keshishian, and the representatives from Luse Gorman "to have a thorough discussion of all the major decisions" regarding the allocation of shares.[20]  They analyzed the circumstances surrounding the peer companies' awards and discussed the EIP, noting the stockholders' authorization of director awards of up to 30% of the EIP's restricted stock options.[21]  Cama proposed and the attendees approved the specific awards—including those to Cama and Cummings.[22]  According to the plaintiffs, however, the 2016 Proxy disclosed that Cummings and Cama did not attend meetings when their "compensation is being determined."[23]  The Committee held a fourth and final meeting on June 23, 2015 when the entire board, after hearing from Keshishian and the Luse Gorman representatives, "approve[d] all the

---

[18] *Id.* at 47 (Compl. ¶ 75).
[19] *Id.* at 71–74 (Compl. ¶¶ 117–22).
[20] *Id.* at 47 (Compl. ¶ 76).
[21] *Id.* at 47–48 (Compl. ¶¶ 76–77).
[22] App. to Opening Br. at 129 (Pls.' Opposition to Defs.' Mot. to Dismiss 15, *In re Investors Bancorp, Inc. Stockholder Litig.*, C.A. No. 12327-VCS (Del. Ch. Oct. 13, 2016).
[23] App. to Opening Br. at 48 (Compl. ¶ 77).

11

components of the incentive stock and option grants for Directors and Management."[24]

The board awarded themselves 7.8 million shares.[25] Non-employee directors each received 250,000 stock options—valued at $780,000—and 100,000 restricted shares—valued at $1,254,000; Cashill and Dittenhafer received 150,000 restricted shares—valued at $1,881,000—due to their years of service. The non-employee director awards totaled $21,594,000 and averaged $2,159,400. Peer companies' non-employee awards averaged $175,817. Cummings received 1,333,333 stock options and 1,000,000 restricted shares, valued at $16,699,999 and alleged to be 1,759% higher than the peer companies' average compensation for executive directors. Cama received 1,066,666 stock options and 600,000 restricted shares, valued at $13,359,998 and alleged to be 2,571% higher than the peer companies' average.

According to the complaint, the total fair value of the awards was $51,653,997, broken down by board member as follows:[26]

| Name | Restricted Stock | Stock Options | Total |
|---|---|---|---|
| Cummings | $12,540,000 | $4,159,999 | $16,699,999 |
| Cama | $10,032,000 | $3,327,998 | $13,359,998 |
| Albanese | $1,254,000 | $780,000 | $2,034,000 |

---

[24] *Id.* (Compl. ¶ 78).
[25] *Id.* at 50 (Compl. ¶ 82).
[26] *Id.* at 51 (Compl. ¶ 32); *In re Investors Bancorp, Inc. Stockholder Litig.*, 2017 WL 1277672, at *5.

12

| | | | |
|---|---|---|---|
| Bone | $1,254,000 | $780,000 | $2,034,000 |
| Byrnes | $1,254,000 | $780,000 | $2,034,000 |
| Cashill | $1,881,000 | $780,000 | $2,661,000 |
| Cosgrove | $1,254,000 | $780,000 | $2,034,000 |
| Dittenhafer | $1,881,000 | $780,000 | $2,661,000 |
| Dugan | $1,254,000 | $780,000 | $2,034,000 |
| Garibaldi | $1,254,000 | $780,000 | $2,034,000 |
| Siekerka | $1,254,000 | $780,000 | $2,034,000 |
| Ward | $1,254,000 | $780,000 | $2,034,000 |
| **Total** | | | **$51,653,997** |

After the Company disclosed the awards, stockholders filed three separate complaints in the Court of Chancery alleging breaches of fiduciary duty by the directors for awarding themselves excessive compensation. Following the filing of a consolidated complaint, the defendants moved to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim and under Court of Chancery Rule 23.1 for failure to make a demand before filing suit.

The Court of Chancery granted both motions and dismissed the plaintiffs' complaint.[27] Relying on the court's earlier decisions in *In re 3COM Corp.*[28] and *Calma on Behalf of Citrix Systems, Inc. v. Templeton*,[29] the court dismissed the complaint against the non-employee directors because the EIP contained "meaningful, specific limits on awards to all director beneficiaries" like the *3COM* plan, as opposed to the broad-based plan in *Citrix* that contained a generic limit

---

[27] *In re Investors Bancorp, Inc. Stockholder Litig.*, 2017 WL 1277672, at *12.
[28] C.A. No. 16721, 1999 WL 1009210 (Del. Ch. Oct. 25, 1999).
[29] 114 A.3d 563 (Del. Ch. 2015).

13

covering director and non-director beneficiaries.[30] The court also dismissed the claims directed to the executive directors because the plaintiffs failed to make a pre-suit demand on the board.

We review the Court of Chancery decision dismissing the complaint *de novo*.[31]

## II.

Unless restricted by the certificate of incorporation or bylaws, Section 141(h) of Delaware General Corporation Law ("DGCL") authorizes the board "to fix the compensation of directors."[32] Although authorized to do so by statute, when the board fixes its compensation, it is self-interested in the decision because the directors are deciding how much they should reward themselves for board service.[33] If no other factors are involved, the board's decision will "lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the

---

[30] *In re Investors Bancorp, Inc. Stockholder Litig.*, 2017 WL 1277672, at *8.
[31] *Gantler v. Stephens*, 965 A.2d 695, 703 (Del. 2009).
[32] 8 *Del. C.* § 141(h).
[33] *Texlon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

compensation arrangements are fair to the corporation."[34]  In other words, the entire fairness standard of review will apply.[35]

Other factors do sometimes come into play.  When a fully informed, uncoerced, and disinterested majority of stockholders approve the board's authorized corporate action, the stockholders are said to have ratified the corporate act.  Stockholder ratification of corporate acts applies in different corporate law settings.[36]  Here, we address the affirmative defense of stockholder ratification of director self-compensation decisions.

*A.*

Early Supreme Court cases recognized a ratification defense by directors when reviewing their self-compensation decisions.  In the 1952 decision *Kerbs v. California Eastern Airways, Inc.*, a stockholder filed suit against the directors attacking a stock option and profit sharing plan on a number of grounds.[37]  As to the

---

[34] *Id.* at 257; *see also Gottlieb*, 90 A.2d at 663 ("[W]here a majority of the directors representing the corporation are conferring benefits upon themselves out of the assets of the corporation, we do not understand [the business judgment rule] to have any application what[so]ever.").

[35] *Citrix*, 114 A.3d at 577 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)) ("[T]he Court reviews the directors' decision under the entire fairness standard, in which case the directors must establish 'to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price.'").

[36] *See, e.g.*, *Gantler*, 965 A.2d at 712 (proposal to reclassify shares); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 166 (series of financial transactions splitting off a subsidiary); *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (amendments to a company's charter and bylaws); *Fliegler v. Lawrence*, 361 A.2d 218, 220 (Del. 1976) (director decision to exercise an option for shares); *Kleinman v. Saminsky*, 200 A.2d 572, 575 (Del. 1964) (underwriting contracts and management fees).

[37] 90 A.2d 652.

15

stock option plan, 250,000 shares of the corporation's unissued stock were granted in specific amounts to named executives of the corporation at a $1 per share exercise price.[38] The profit sharing plan was based on a mathematical formula tied to the financial performance of the corporation.[39] Both plans were approved at a board meeting where five of the eight directors were beneficiaries of both plans.[40] The stockholders approved the plans.

Addressing the effect of stockholder approval of the stock option plan, our Court held that "ratification cures any voidable defect in the action of the [b]oard. Stockholder ratification of voidable acts of directors is effective for all purposes unless the action of the directors constituted a gift of corporate assets to themselves or was ultra vires, illegal, or fraudulent."[41] As to the profit sharing plan, the Court viewed things differently because "the effectiveness of such ratification depends upon the type of notice sent to the stockholder and the explanation to them of the plan itself,"[42] and the record on appeal was insufficient to determine the adequacy of the disclosures.[43]

---

[38] *Id.* at 655.
[39] *Id.*
[40] *Id.*
[41] *Id.* (citations omitted).
[42] *Id*. at 659–60.
[43] *Id.* at 655.

The stock option plan approved by the stockholders in *Kerbs* was self-executing, meaning once approved by the stockholders, implementing the awards required no discretion by the directors.[44] The Court addressed a similar dispute in a case decided the following day. In *Gottlieb v. Heyden Chemical Corp.*,[45] the restricted stock option plan granted specific company officers—six of whom were board members—present and future options to purchase fixed amounts of common stock at prices to be set by the board, subject to a price collar. The plan was contingent upon ratification by a majority of the stockholders.[46] In advance of the stockholder meeting, the board disclosed the names of the officers receiving the awards, the number of shares allocated to each, the price per share, and the schedule for future issuances.[47] The stockholders approved the plan.[48]

After initially denying the stockholder's challenge to the plan, on reargument, the Court noted the effect of stockholder ratification. For the current awards specifically approved by the stockholders:

> Where there is stockholder ratification, . . . the burden of proof is shifted
> to the objector. In such a case the objecting stockholder must convince
> the court that no person of ordinary sound business judgment would be

---

[44] *Id.*
[45] 90 A.2d 660 (Del. 1960).
[46] *Id.* at 661.
[47] *Id.* at 662.
[48] *Id.*

17

expected to entertain the view that the consideration furnished by the individual directors is a fair exchange for the options conferred.[49]

But, for the options subject to future awards, the court explained that they were not ratified because the 25,500 shares had not been placed into any contracts prior to approval.[50] The stockholders only approved the allocation of shares "of a certain general pattern," but "nobody [knew] what all of the terms of these future contracts [would] be."[51] The Court concluded that ratification "cannot be taken to have approved specific bargains not yet proposed."[52] Thus, after *Kerbs* and *Gottlieb*, directors could successfully assert the ratification defense when the stockholders were fully informed and approved stock option plans containing specific director awards. But the award of "specific bargains not yet proposed" could not be ratified by general stockholder approval of the compensation plan.[53]

---

[49] *Gottlieb*, 91 A.2d at 58; *see id.* ("Where there was stockholder ratification, however, the court will look into the transaction only far enough to see whether the terms are so unequal as to amount to waste, or whether, on the other hand, the question is such a close one as to call for the exercise of what is commonly called 'business judgment.'").

[50] *Id.* at 59–60.

[51] *Id.* at 60.

[52] *Id.* In another early case, *Kaufman v. Shoenberg*, 91 A.2d 786 (Del. Ch. 1952), the Court of Chancery addressed a stockholder challenge to the consideration the corporation received for a restricted stock option plan. The plan in *Kaufman* did not specify the awards to be issued, but the awards were administered by a board committee that did not receive options under the plan. *Id.* at 788–89, 793. The Chancellor held that "independent stockholder ratification of an interested director transaction" led to the conclusion that "the objecting stockholder has the burden of showing that no person of ordinary sound business judgment would say that the consideration received for the options was a fair exchange for the options granted." *Id.* at 791.

[53] *Gottlieb*, 91 A.2d at 58.

Our Court has not considered ratification of director self-compensation decisions since *Kerbs* and *Gottlieb*. The Court of Chancery has, however, continued to develop this area of the law.

*B.*

Following the Supreme Court's lead recognizing the ratification defense only when specific acts are presented to the stockholders for approval, the Court of Chancery in *Steiner v. Meyerson*[54] and *Lewis v. Vogelstein*[55] recognized the directors' ratification defense when awards made to directors under equity compensation plans were specific as to amounts and value. In *Steiner*, the stock option plan granted each non-employee director "an option to purchase 25,000 shares upon election to the Telxon board, and an additional 10,000 shares on the anniversary of his election while he remains on the board."[56] In *Lewis*, the plan provided for two categories of director compensation: (i) one-time grants of 15,000 options per director; and (ii) annual grants of up to 10,000 options per director depending on length of board service.[57] The plans were self-executing, meaning that no further director action was required to implement the awards as they were earned. In both cases, the Court of

---

[54] C.A. No. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995).
[55] 699 A.2d at 338.
[56] 1995 WL 441999, at *5.
[57] 699 A.2d at 329–30.

19

Chancery held that the stockholders validly ratified the awards, and the standard of review following ratification was waste.[58]

Two Court of Chancery decisions following *Steiner* and *Lewis* addressed a twist in previous cases that bears directly on this appeal—the plans approved by the stockholders set upper limits on the amounts to be awarded, but allowed the directors to decide the specific awards or change the conditions of the awards after stockholder approval.[59] In *In re 3COM Corp. Shareholders Litigation*, the option grants were based on "specific ceilings on the awarding of options each year" which "differ based on specific categories of service, such as service on a committee, position as a lead director, and chairing the [b]oard."[60] The plaintiff alleged in conclusory fashion that grants made by the board were "lavish and excessive compensation tantamount to a waste of corporate assets."[61] Because the board exercised its discretion within the specific limits approved by the stockholders, the Court of

---

[58] In *Lewis*, Chancellor Allen explored the ratification defense through the lens of agency, finding that ratification "contemplates the ex post conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority. . . . [T]he effect of informed ratification is to validate or affirm the act of the agent as the act of the principal." 699 A.2d at 334 (citing Restatement (Second) of Agency § 82 (1958)). The Chancellor also observed that the standard of review following stockholder ratification of director self-compensation decisions evolved from the *Kerbs* proportionality or reasonableness standard when considering the adequacy of the consideration to a waste standard. *Id.* at 338 (citing *Michelson v Lewis*, 407 A.2d 211 (Del. 1979)).

[59] *In re 3Com Corp. S'holders Litig.*, 1999 WL 1009210, at *2–3; *Criden v. Steinberg*, 2000 WL 354390, at *2 (Del. Ch. Mar. 23, 2000).

[60] 1999 WL 1009210, at *3 n.9.

[61] *Id.* at *1.

Chancery determined that the stockholder approval of the plan parameters extended to the specific awards made after plan approval.[62]  Thus, the directors' post-approval compensation decisions were subject to the business judgment rule standard of review, requiring the directors to show waste.[63]

In *Criden v. Steinberg*, the Court of Chancery addressed a broad-based stock option plan that allowed the directors to re-price the options after stockholder approval of the plan.[64]  The re-pricing decisions, although not submitted to the stockholders for approval, were subject to a business judgment standard of review.[65]  According to the court, the stockholders approved a plan setting the re-pricing parameters, and the directors re-priced the options within those parameters.[66]  Thus, the directors' decisions were reviewed under a business judgment rule standard of review.

After *3COM* and *Criden*, the Court of Chancery decided *Sample v. Morgan*.[67]  In *Sample*, the Court addressed two non-employee directors on the compensation committee who awarded 200,000 shares to the company's three employee directors under a management stock incentive plan.[68]  A disinterested majority of Randall

---

[62] *Id.* at *2.
[63] *Id.*
[64] 2000 WL 354390.
[65] *Id.* at *3–4.
[66] *Id.* at *4.
[67] *Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007).
[68] The company granted 100,000 shares to the CEO, 75,000 shares to the Vice President of Manufacturing, and 25,000 shares to the CFO.  *Id.* at 654.

21

Bearings' stockholders had previously approved the plan, which authorized up to 200,000 shares, with no parameters on how the shares should be awarded. The court rejected a ratification defense and stated:

> [T]he Delaware doctrine of ratification does not embrace a "blank check" theory. When uncoerced, fully informed, and disinterested stockholders approve a specific corporate action, the doctrine of ratification, in most situations, precludes claims for breach of fiduciary duty attacking that action. But the mere approval by stockholders of a request by directors for the authority to take action within broad parameters does not insulate all future action by the directors within those parameters from attack. Although the fact of stockholder approval might have some bearing on consideration of a fiduciary duty claim in that context, it does not, by itself, preclude such a claim. An essential aspect of our form of corporate law is the balance between law (in the form of statute and contract, including the contracts governing the internal affairs of corporations, such as charters and bylaws) and equity (in the form of concepts of fiduciary duty). Stockholders can entrust directors with broad legal authority precisely because they know that that authority must be exercised consistently with equitable principles of fiduciary duty. Therefore, the entrustment to the [compensation committee] of the authority to issue up to 200,000 shares to key employees under discretionary terms and conditions cannot reasonably be interpreted as a license for the [c]ommittee and other directors making proposals to it to do whatever they wished, unconstrained by equity. Rather, it is best understood as a decision by the stockholders to give the directors broad legal authority and to rely upon the policing of equity to ensure that that authority would be utilized properly. For this reason alone, the directors' ratification argument fails.[69]

The court in *Sample* did not address either *3COM* or *Criden*. But, in *Seinfeld v. Slager*,[70] the court addressed *3COM* and a concern that recognizing ratification for

---

[69] *Id.* at 663–64.
[70] 2012 WL 2501105, at *11–12.

plans approved by stockholders with only general parameters for making compensation awards provided insufficient protection from possible self-dealing. The plan in *Seinfeld* was a broad-based plan applying to directors, officers, and employees.[71] Unlike the plan in *3COM*, where each category of beneficiaries had an upper limit on what they could receive, the *Seinfeld* plan contained a single generic limit on awards, with no restrictions on how the awards could be distributed to the different classes of beneficiaries.[72] Rather than essentially approve a blank check, or in the Vice Chancellor's words—give the directors carte blanche—to make awards as the directors saw fit, the court required "some *meaningful* limit imposed by the stockholders on the [b]oard for the plan to be consecrated by *3COM* and receive the blessing of the business judgment rule."[73] Thus, after *Seinfeld*, directors could retain the discretion to make awards after stockholder plan approval, but the plan had to contain meaningful limits on the awards the directors could make to themselves before ratification could be successfully asserted.

Finally, in *Cambridge Retirement System v. Bosnjak*, although the plan did not set forth the specific compensation awarded to the directors, the specific awards

---

[71] *Id.* at *10.

[72] *Id.*

[73] *Id.* at *12. The court went on to hold that "[i]f a board is free to use its absolute discretion under even a stockholder-approved plan, with little guidance as to the *total* pay that can be awarded, a board will ultimately have to show that the transaction is entirely fair." *Id.*

23

were submitted to the stockholders for approval.[74]  Thus, the court found that the directors could assert a ratification defense.[75]  And, in *Calma on Behalf of Citrix Systems, Inc. v. Templeton*, Chancellor Bouchard, after a thorough review of the case law, determined that directors could not assert a ratification defense when the incentive plan had generic limits on compensation for all the plan beneficiaries.[76] The court denied a ratification defense, holding "when the [b]oard sought stockholder approval of the broad parameters of the plan and the generic limits specified therein, Citrix stockholders were not asked to approve any action specific to director compensation."[77]

## III.

### *A.*

As ratification has evolved for stockholder-approved equity incentive plans, the courts have recognized the defense in three situations—when stockholders approved the specific director awards; when the plan was self-executing, meaning the directors had no discretion when making the awards; or when directors exercised discretion and determined the amounts and terms of the awards after stockholder approval.  The first two scenarios present no real problems.  When stockholders

---

[74] C.A. No. 9178-CB, 2014 WL 2930869, at *2 (Del. Ch. June 26, 2014).
[75] *Id*. at *8–9; *see also Desimone*, 924 A.2d at 917 (dismissing a claim challenging option grants because stockholders approved the specific amount to be granted).
[76] 114 A.3d 563.
[77] *Id.* at 588 (emphasis omitted).

know precisely what they are approving, ratification will generally apply. The rub comes, however, in the third scenario, when directors retain discretion to make awards under the general parameters of equity incentive plans. The defendants rely on *3COM* and *Criden*, where the Court of Chancery recognized a stockholder ratification defense even though the directors' self-compensation awards were not submitted for stockholder approval.[78] As noted earlier, in *3COM*, the Court of Chancery recognized ratification for director-specific compensation plans, where the plans contained specific limits for awards depending on factors set forth in the plan.[79] In *Criden*, the court upheld a ratification defense when the plan authorized the directors to re-price the options after stockholder approval.[80]

The court's decisions in *3COM* and *Criden* opened the door to the difficulties raised in this appeal. After those decisions, the Court of Chancery had to square *3COM* and *Criden*—and their expanded use of ratification for discretionary plans—with existing precedent, which only recognized ratification when stockholders

---

[78] Answering Br. at 17–18, 23; *In re 3COM Corp.*, 1999 WL 1009210; *Criden*, 2000 WL 354390. The defendants also rely on *Steiner*, 1995 WL 441999, and *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, but those cases are not helpful to their argument. The plan in *Steiner* was self-executing. 1995 WL 441999, at *4 ("The plan grants each director an option to purchase 25,000 shares upon election to the Telxon board, and an additional 10,000 shares on the anniversary of his election while he remains on the board."). In *Cambridge Retirement System*, the stockholders approved the specific awards made by the directors. 2014 WL 2930869, at *8 ("Unilife stockholders approved the grant of up to 100,000 options to two of the [c]ompany's outside directors and, in 2011, approved the grant of up to 45,000 stock-based awards to six of the Company's outside directors.").
[79] 1999 WL 1009210, at *3.
[80] 2000 WL 354390, at *4.

approved the specific awards. The Court of Chancery tried to harmonize the decisions by requiring "meaningful limits" on the amounts directors could award to themselves.

We think, however, when it comes to the discretion directors exercise following stockholder approval of an equity incentive plan, ratification cannot be used to foreclose the Court of Chancery from reviewing those further discretionary actions when a breach of fiduciary duty claim has been properly alleged. As the Court of Chancery emphasized in *Sample*, using an expression coined many years ago, director action is "twice-tested," first for legal authorization, and second by equity.[81] When stockholders approve the general parameters of an equity compensation plan and allow directors to exercise their "broad legal authority" under the plan, they do so "precisely because they know that that authority must be exercised consistently with equitable principles of fiduciary duty."[82] The stockholders have granted the directors the legal authority to make awards. But, the directors' exercise of that authority must be done consistent with their fiduciary duties. Given that the actual awards are self-interested decisions not approved by the stockholders, if the directors acted inequitably when making the awards, their

---

[81] *Sample*, 914 A.2d at 672 (Strine, V.C.) (citing Adolf A. Berle, *Corporate Powers as Powers in Trust*, 44 HARV. L. REV. 1049, 1049 (1931)) ("Corporate acts thus must be 'twice-tested'—once by the law and again by equity.").
[82] *Id.* at 584.

"inequitable action does not become permissible simply because it is legally possible"[83] under the general authority granted by the stockholders.

The *Sample* case underlines the need for continued equitable review of self-interested discretionary director self-compensation decisions. As noted before, the plaintiffs in *Sample* alleged that the board adopted "a self-dealing plan to entrench the Company under the then-current management and massively dilute the equity interests of the public holders to benefit management personally."[84] If ratification could be invoked at the outset, those breach of fiduciary duty allegations would be insulated from judicial review. Other cases reinforce the same point—when a stockholder properly alleges that the directors breached their fiduciary duties when exercising their discretion after stockholders approve the general parameters of an equity incentive plan, the directors should have to demonstrate that their self-interested actions were entirely fair to the company.[85]

---

[83] *Schnell v. Chris-Craft Ind., Inc.*, 285 A.2d 487, 489 (Del. 1971). As noted in *Desimone v. Barrows*, 924 A.2d 908, 917 (Del. Ch. 2007), "[s]pecifying the precise amount and form of director compensation . . . 'ensure[s] integrity' in the underlying principal–agent relationship between stockholders and directors."

[84] 914 A.2d at 659 (Pet'rs' Second Am. Class Action & Derivative Compl. ¶ 55, *Sample*, 2005 WL 5769871 (Del. Ch. May 24, 2015)).

[85] For example, in *Seinfeld*, the Court of Chancery refused to extend stockholder approval of the plan to the awards themselves. 2012 WL 2501105, at *12. The directors had the "theoretical ability to award themselves as much as tens of millions of dollars per year, with few limitations." *Id.* The board was also "free to use its absolute discretion . . . with little guidance as to the total pay that can be awarded." *Id.* In *Citrix*, where the stockholders challenged the awards as out of line with peer group compensation, the plan broadly authorized payments as high as $55 million a year to any one person. 114 A.3d at 587–88. Because the plan lacked any restrictions on the amounts the directors could allocate to themselves, ratification could not be used to prevent

*B.*

The Investors Bancorp EIP is a discretionary plan as described above. It covers about 1,800 officers, employees, non-employee directors, and service providers. Specific to the directors, the plan reserves 30,881,296 shares of common stock for restricted stock awards, restricted stock units, incentive stock options, and non-qualified stock options for the Company's officers, employees, non-employee directors, and service providers.[86] Of those reserved shares and other equity, the non-employee directors were entitled to up to 30% of all option and restricted stock shares, all of which could be granted in any calendar year.[87] But, "[t]he number, types, and terms of the awards to be made pursuant to the [EIP] are subject to the discretion of the Committee and have not been determined at this time, and will not be determined until subsequent to stockholder approval."[88]

When submitted to the stockholders for approval, the stockholders were told that "[b]y approving the Plan, stockholders will give [the Company] the flexibility [it] need[s] to continue to attract, motivate and retain highly qualified officers, employees and directors by offering a competitive compensation program that is

---

equitable review. *Id.* at 588. In both cases, if the directors acted inequitably in exercising their broad discretionary powers under the plans, those decisions should be subject to review by the Court of Chancery.

[86] Opening Br. at 11; App. to Answering Br. at 349 (Investors Bancorp, Inc., 2014 Proxy, Appendix A: Equity Incentive Plan, at A-5 § 3.2(a) (June 9, 2015) [hereinafter EIP]).

[87] App. to Answering Br. at 349–50 (EIP, at A-5 § 3.3).

[88] *Id.* at 336 (2014 Proxy, at 57).

linked to the performance of [the Company's] common stock."[89]  The complaint

alleges that this representation was reasonably interpreted as forward-looking.  In

other words, by approving the EIP, stockholders understood that the directors would

reward Company employees for future performance, not past services.

After stockholders approved the EIP, the board eventually approved just under

half of the stock options available to the directors and nearly thirty percent of the

shares available to the directors as restricted stock awards, based predominately on

a five-year going forward vesting period.  The plaintiffs argue that the directors

breached their fiduciary duties by granting themselves these awards because they

were unfair and excessive.[90]  According to the plaintiffs, the stockholders were told

the EIP would reward future performance, but the Board instead used the EIP awards

to reward past efforts for the mutual-to-stock conversion—which the directors had

already accounted for in determining their 2015 compensation packages.[91]  Also,

according to the plaintiffs, the rewards were inordinately higher than peer

companies'.  As alleged in the complaint, the Board paid each non-employee director

more than $2,100,000 in 2015,[92] which "eclips[ed] director pay at every Wall Street

---

[89] *Id.* at 329 (2014 Proxy, at 50).
[90] App. to Opening Br. at 50 (Compl. ¶ 83).
[91] *Id.* at 42–43 (Compl. ¶ 65).
[92] App. to Opening Br. at 136 (Pls.' Opposition to Defs.' Mot. to Dismiss 22 (citing Compl. ¶¶ 88–89)).

firm."[93]    This significantly exceeded the Company's non-employee director compensation in 2014, which ranged from $97,200 to $207,005.[94]    It also far surpassed the $198,000 median pay at similarly sized companies and the $260,000 median pay at much larger companies.[95]    And the awards were over twenty-three times more than the $87,556 median award granted to other companies' non-employee directors after mutual-to-stock conversions.[96]

In addition, according to the complaint, Cama and Cummings' compensation far exceeded their prior compensation and that of peer companies.  Cummings' $20,006,957 total compensation in 2015 was seven times more than his 2014 compensation package of $2,778,000.[97]    And Cama's $15,318,257 compensation was nine times more than his 2014 compensation package of $1,665,794.[98] Cummings' $16,699,999 award was 3,683% higher than the median award other companies granted their CEOs after mutual-to-stock conversions.  And Cama's

---

[93] *Id.* at 58 (Compl. ¶ 96 (quoting Caleb Melby, *New Jersey Bank Pays Directors More than at Any Finance Firm*, BLOOMBERG (May 5, 2016, 5:00AM), https://www.bloomberg.com/news/articles/2016-05-05/new-jersey-bank-pays-directors-more-than-any-wall-street-board)).

[94] *Id.* at 32 (Compl. ¶ 35).

[95] *Id.* at 57–58 (Compl. ¶ 95).  Plaintiffs allege the 75th percentile of pay at these companies was $227,000. *Id.*

[96] *Id.* at 51–54 (Compl. ¶¶ 85–86).  As alleged in the complaint, the average award at these companies was $175,817.  *Id.*

[97] *Id.* at 32–33, 64 (Compl. ¶¶ 37, 105).  According to plaintiffs, CEO compensation at peer companies averaged $4,170,000—approximately one-fifth of Cummings' compensation and one-fourth of Cama's.  App. to Opening Br. at 139 (Pls.' Opposition to Defs.' Mot. to Dismiss 25).

[98] *Id.* at 33 (Compl. 15 ¶ 38).

$13,359,998 award was 5,384% higher than the median other companies granted their second-highest paid executives after the conversions.[99]

The plaintiffs have alleged facts leading to a pleading stage reasonable inference that the directors breached their fiduciary duties in making unfair and excessive discretionary awards to themselves after stockholder approval of the EIP. Because the stockholders did not ratify the specific awards the directors made under the EIP, the directors must demonstrate the fairness of the awards to the Company.

## IV.

The parties raise a last issue—whether the plaintiffs are excused from making a demand on the board under Court of Chancery Rule 23.1 for the awards made to executive directors Cama and Cummings. The directors do not contest that they are interested for the awards they made to themselves. But, according to the directors, the awards made to the two executive directors were not part of a "single transaction" because these awards were made as part of a series of compensation meetings

---

[99] *Id.* at 64 (Compl. ¶ 104). The average awards at peer companies were $898,490 for CEOs and $510,435 for the second-highest paid executives. *Id.* at 61–64 (Compl. ¶ 103). The plaintiffs also point out that this discrepancy with peer companies greatly exceeds the discrepancies in *Citrix*, in which the Court of Chancery found the plaintiffs sufficiently alleged an unfair compensation claim. In *Citrix*, non-employee director compensation ranged from $303,360 to $425,570, which was "on average over $100,000 more" than peer companies that had "stock significantly outperforming Citrix." Pls.' S'holder Derivative Compl. ¶¶ 2, 9–10, *Citrix*, No. 9579-CB, 2014 WL 1873725 (Del. Ch. May 6, 2014). Since the board's change in director compensation, the peer companies' stock increased 5% on average, while Citrix's stock performed 43% worse. *Id.* ¶ 28. The court found these numbers stated a cognizable claim of unfair compensation and allowed the case to proceed. *Citrix*, 114 A.3d at 589–90.

31

following the EIP's adoption. Further, they argue, the plaintiffs failed to demonstrate a "quid pro quo" between the non-employee directors and Cama and Cummings. Thus, the non-employee directors claim they would be capable of exercising independent judgment to consider a demand challenging the board's awards to the executive directors.

Demand is futile when, under the particular facts alleged, a reasonable doubt is created that (1) a majority of the board is disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.[100] Although showing a *quid pro quo* might be one way of proving interestedness or lack of independence, it is not a requirement. Rather, the focus is on the acts being challenged and the relationship between those acts and the directors who approved them. Here, immediately after the Investors Bancorp stockholders approved the EIP, the directors held a series of nearly contemporaneous meetings that resulted in awards to both the non-employee directors and the executive directors. It is implausible to us that the non-employee directors could independently consider a demand when to do so would require those directors to call into question the grants they made to themselves. In other words, "[i]t strains reason to argue that a defendant–director could act independently to evaluate the merits of

---

[100] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

bringing a legal action against any of the other defendants if the director participated in the identical challenged misconduct."[101]  Thus, demand is excused for the claims made against non-employee and executive directors.

## V.

The Investors Bancorp stockholders approved the general parameters of the EIP.  The plaintiffs have properly alleged, however, that the directors, when exercising their discretion under the EIP, acted inequitably in granting themselves unfair and excessive awards.  Because the stockholders did not ratify the specific awards under the EIP, the affirmative defense of ratification cannot not be used to dismiss the complaint.  The plaintiffs have also demonstrated that demand would be futile as to all directors.  Thus, the Court of Chancery's decision is reversed, and the case is remanded for further proceedings consistent with this opinion.

---

[101] *Needham v. Cruver*, C.A. No. 12428, 1993 WL 179336, *3 (Del. Ch. May 12, 1993).