# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| APPLIED ENERGETICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0489-TMR |
| | ) | |
| GEORGE FARLEY and | ) | |
| ANNEMARIECO., LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  January 11, 2019
Date Decided:  January 23, 2019
Date Revised: January 24, 2019

Jason C. Jowers, Meghan A. Adams, and Ian D. McCauley, MORRIS JAMES LLP, Wilmington, Delaware; David A. Robinson, Benjamin P. Pugh, Michael S. Wilde, ENTERPRISE COUNSEL GROUP, A LAW CORPORATION, Irvine, California; *Attorneys for Plaintiff*.

Kathleen M. Miller and Clarissa R. Chenoweth, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Ryan J. Whalen, GUSRAE KAPLAN NUSBAUM PLLC, New York, New York; *Attorneys for Defendants*.

**MONTGOMERY-REEVES, Vice Chancellor.**

This case centers on a director's issuance of shares of stock to himself. At the time of the issuance, the company was in shell status, a status where the corporation suspends its business activities. Nonetheless, the director issued himself twenty-five million shares of the company's stock (over one fourth of the company's outstanding stock at that time) as compensation for his services as the company's lone officer and director.

The director issued himself these shares just five days after the only other director resigned. Perhaps coincidentally, that director resigned shortly after objecting to the very issuance that is the subject of this litigation. Because he was the only director, approval by an independent director was not possible; the director also did not seek stockholder approval.

The director did hire a valuation expert at the time of the challenged stock issuance, but he decided not to wait to receive that valuation. Instead, he based the price off his own experience valuing restricted stock and off another transaction in which he appears to have unilaterally determined the price. The director set the issuing price at approximately one fourth of the trading price at that time. He justified this reduction with discounts for the company's shell status and for the stock's low trading volume. The director, however, did not include any price adjustment for material nonpublic information he had at the time. This information included the company's plan to restart its business activities and exit shell status.

After receiving stockholder complaints, the lone director circled back to the expert he hired and pressed for a valuation. Each valuation from that expert, however, came in higher than the price at which he issued himself the challenged shares—that is, until he told the expert the exact price he needed. Notably, even the director's own litigation expert valued the shares at almost two times the price at which the director issued the stock.

Not surprisingly, this transaction led to stockholder dissatisfaction and eventually led to a stockholder vote removing the director and replacing him with a three-person board of directors. Stockholder litigation followed. Now, the corporation is pursuing its claims against the former director. Through the currently pending motion, the corporation seeks a preliminary injunction to prevent the Defendants from selling the twenty-five million shares at issue during the pendency of this litigation. For the reasons explained in this opinion, I grant the requested preliminary injunction.

## I. BACKGROUND

The facts of this case derive from the pleadings, the affidavits, and the exhibits submitted to this Court. I also take judicial notice of Applied Energetics, Inc.'s

("Applied Energetics" or the "Company") SEC filings and historical data for Applied Energetics stock.[1]

### A.     Applied Energetics Enters Shell Status

Applied Energetics is a Delaware corporation with its principal place of business in Tucson, Arizona.[2]  Its primary business involves the development of technology used by the Department of Defense and related contractors.[3]  In 2004, Applied Energetics merged with another corporation.[4]  The resulting five-person board included George Farley.[5]

Applied Energetics continued growing its business until approximately 2011.[6]  After 2011, demand for its defense technology ceased.[7]  At that time, the Company had a three-member board.[8]  In October 2014, Applied Energetics' board chose to

---

[1]     D.R.E. 201.

[2]     Compl. ¶ 4.

[3]     Schultz Decl. ¶¶ 2-3.

[4]     Adams Aff. Ex. 2, at 1.

[5]     *Id.* at 2.

[6]     Miller Aff. Ex. 14, at 7-9.

[7]     Farley Decl. ¶ 10.

[8]     Applied Energetics, Inc., Annual Report (Form 10-K) 23 (Mar. 29, 2013); Applied Energetics, Inc., Current Report (Form 8-K) (July 10, 2012).

place the corporation in "shell" status.[9]   Farley,[10] Mark Lister, and John Levy comprised the Company's board of directors.[11]

### B. Farley's and Levy's Divergent Business Plans for Applied Energetics

Lister resigned in March 2015, leaving only Farley and Levy.[12]  At that same time, the board designated Farley as the Principal Executive Officer (the "PEO") and the Principal Financial Officer.[13]  Farley and Levy disagreed on how to run Applied Energetics.  Farley quickly developed plans to restart the business and take the Company out of shell status.[14]  He wanted to find new applications for the Company's intellectual property, and he pursued licensing deals with third parties.[15] For example, in late 2015 and early 2016, Farley discussed a potential deal with Steven McCahon, one of the Company's founders and its former executive vice president, to use Applied Energetics' intellectual property in the clean energy

---

[9]     Adams Aff. Ex. 1.

[10]    After initially identifying individuals, I reference surnames without honorifics or regard to formal titles such as "Doctor."  I intend no disrespect.

[11]    Applied Energetics, Inc., Annual Report (Form 10-K) 23 (Apr. 14, 2014).

[12]    Adams Aff. Ex 3.

[13]    *Id.*

[14]    Farley Decl. ¶ 22.

[15]    *Id.*

industry.[16]  Farley also wanted to acquire control of Applied Energetics.[17]  He pursued, unsuccessfully, a Small Business Administration loan for capital with which to buy Applied Energetics stock.[18]

Levy, on the other hand, did not think Farley would be successful in capitalizing on Applied Energetics' intellectual property portfolio.[19]  Levy told Farley that the Company should not spend any money to protect its intellectual property, essentially abandoning the Company's intellectual property.[20]

In January 2016, Levy reached his breaking point.  The Company had not paid its directors while the Company was in shell status.[21]  Farley informed Levy in late January that he (Farley) planned on issuing stock to himself and Levy in lieu of compensation.[22]  Levy did not agree with this plan.[23]  He submitted his resignation and explicitly requested that the disclosure of his resignation be kept separate from

---

[16]     *Id.* ¶¶ 28-30.

[17]     Adams Aff. Ex. 7.

[18]     *Id.*

[19]     Farley Decl. ¶ 23.

[20]     *Id.* ¶ 25.

[21]     *See* Adams Aff. Ex. 1.

[22]     Adams Aff. Ex. 6 (Farley dep.) 43:17-44:1.

[23]     Levy Decl. ¶ 3; Adams Aff. Ex. 8, at 1.

6

the disclosure of any grant of shares.[24]  Levy's resignation was effective February 10, 2016.[25]

### C.  Farley's Action as Applied Energetics' Sole Director and Officer

On February 15, 2016, Farley executed a written consent as the Company's sole director to issue himself twenty million shares.[26]  He issued the stock at $0.001, par value.[27]  As Farley explained later, he believed that $0.001 was a fair price for the stock because the stock was issued with a restrictive legend and could not be sold for at least a year after the Company restarted its business and left shell status.[28] Additionally, the stock did not trade heavily, averaging a daily volume of approximately 45,000 shares in the beginning of 2016.[29]  Farley used these two factors to discount the approximately $0.004 market price to $0.001.[30]  The Company used the same price when issuing stock to Stein Riso Mantel McDonough

---

[24]     Levy Decl. ¶ 6; Adams Aff. Ex. 8, at 1.

[25]     Adams Aff. Ex. 87, at 2.

[26]     Adams Aff. Ex. 23, at 2-3.

[27]     *Id.* at 1; Miller Aff. Ex. 93, at 1.

[28]     Farley Decl. ¶ 39.

[29]     The average daily trading volume for the period January 1, 2016, through February 14, 2016, is 44,741.2.

[30]     Adams Aff. Ex. 6 (Farley dep.) 67:20-68:19.

LLP ("Stein Riso") to pay for legal services.[31] Farley agreed to pay Stein Riso for $10,000 of past legal services by causing the Company to issue ten million shares of stock at $0.001 per share.[32]

Additionally as part of the February 15 written consent, Farley caused the Company to issue twenty million shares to McCahon. During the last quarter of 2015, Farley and McCahon discussed a plan to restart the Company's business.[33] After exploring different possibilities, Farley and McCahon decided that Applied Energetics would enter into a consulting agreement with McCahon.[34] In exchange for his services, McCahon would receive twenty million shares of Company stock.[35] The consulting agreement is dated February 23, 2016, eight days after Farley authorized the issuance of McCahon's twenty million shares.[36]

As part of the same February 15 written consent, Farley caused the Company to issue two million shares to Stephen McCommon for accounting services and one

---

[31]  Adams Aff. Ex. 23, at 1.

[32]  Farley Decl. ¶¶ 38-39, 45.

[33]  Adams Aff. Ex. 6 (Farley dep.) 39:19-25.

[34]  *Id.* at 65:10-23.

[35]  *Id.* at 66:5-9. Under the terms of the consulting agreement, the Company obligated itself to pay McCahon an annual fee of $150,000 in addition to McCahon's stock compensation, to be paid when the Company had sufficient funds. Adams Aff. Ex. 10, at 1.

[36]  Adams Aff. Ex. 10, at 1.

8

million shares of stock to Christopher Rahne for his valuation of the Company's stock.[37] The Company issued all shares at par value, $0.001.[38] In a separate issuance, Farley caused the Company to issue five million shares at par value to Greg Fettig, Applied Energetics' patent counsel.[39]

On February 15, 2016, Farley also approved the issuance to himself of five million additional shares under the Company's 2007 Stock Incentive Plan.[40] The Company issued these shares at $0.001 per share, and this grant reflected additional compensation to Farley above his regular compensation.[41]

The Company disclosed McCahon's consulting agreement, its plan to reactivate the Company's business activities, and the stock issuances in its March 30, 2016 Annual Report.[42] Farley received his twenty-five million shares at the end

---

[37] Adams Aff. Ex. 23, at 1-2.

[38] *Id.* at 1.

[39] Farley Decl. ¶ 71.

[40] Adams Aff. Ex. 11; Miller Aff. Ex. 51.

[41] Adams Aff. Ex. 6 (Farley dep.) 96:8-18; Miller Aff. Ex. 52, at 1.

[42] Applied Energetics, Inc., Annual Report (Form 10-K) 1-2, 7, F-19 (March 30, 2016).

of March 2016.[43]  In early- to mid-April 2016, multiple stockholders contacted Farley to complain about Farley's issuance of stock to himself.[44]

### D.    Farley Transfers Shares to AnneMarieCo., LLC

On April 26, 2016, Farley transferred twenty million of his shares to AnneMarieCo., LLC ("AnneMarieCo").[45]  AnneMarieCo is a New Jersey limited liability company owned by Farley's wife and six children.[46]  Each child owns a sixteen-percent interest in AnneMarieCo, and Mrs. Farley holds the remaining four percent.[47]  Mrs. Farley is the President of AnneMarieCo[48] and one of its two directors.[49]  In the past, Farley transferred Applied Energetics stock to AnneMarieCo as part of his estate planning.[50]

SEC regulations required that Applied Energetics disclose Farley's April 26 transfer of twenty million shares to AnneMarieCo.  Applied Energetics initially

---

[43]    Adams Aff. Ex. 14.

[44]    Hayden Decl. ¶ 4; Hudgins Decl. ¶¶ 6-7.

[45]    Adams Aff. Ex. 29.

[46]    *Id.* at 2.

[47]    *Id.*

[48]    Adams Aff. Ex. 49.

[49]    Adams Aff. Ex. 52.

[50]    *See* Miller Aff. Ex. 1 (Capital Gains and Losses for 2006, 2007, and 2008).

10

failed to disclose the relationship between its sole director, Farley, and AnneMarieCo when disclosing the stock transfer on April 27, 2017.[51]  On May 24, 2017, the SEC requested that Applied Energetics amend its filing to disclose any "material relationships" between AnneMarieCo and Farley.[52]   The Company amended its registration statement on August 21, 2017, but it failed to address all the disclosure issues the SEC had raised.[53]  The SEC, therefore, sent a second letter on September 5, 2017.[54]  Two more amended registration statements, on September 15 and 22, 2017, still failed to address the issue of material relationships.[55]  The SEC sent a third letter on October 4, 2017, again requesting that Applied Energetics disclose the material relationship between Farley and AnneMarieCo because members of Farley's family own AnneMarieCo.[56]  Finally, on October 31, 2017, six months after the first registration statement, Applied Energetics disclosed the relationship between Farley and AnneMarieCo.  The disclosure correctly states that Farley's children own interests in AnneMarieCo and do not reside with Farley.

---

[51]     Adams Aff. Ex. 53, at 32.

[52]     *See* Adams Aff. Ex. 54, at 2.

[53]     Adams Aff. Ex. 55, at 33.

[54]     Adams Aff. Ex. 56, at 2.

[55]     Adams Aff. Ex. 57, at 35; Adams Aff. Ex. 58, at 33.

[56]     Adams Aff. Ex. 59.

11

Applied Energetics did not disclose that Farley's wife owns an interest in AnneMarieCo or that the registered agent address for AnneMarieCo is Farley's residence.[57]

In May 2018, AnneMarieCo asked Applied Energetics' stock transfer company, Continental Stock Transfer & Trust Company ("Continental"), to remove the restrictive legend from the AnneMarieCo shares.[58] Farley assisted in this process and wrote an email to his son Thomas, one of AnneMarieCo's members, with instructions on how to sell the shares.[59] He not only instructed Thomas how AnneMarieCo should sell the shares, but he drafted the email for Thomas to send to Continental.[60]

### E. Rahne's Valuation of the Company Stock

Rahne was a long-time associate of Farley and a purported expert in valuation.[61] Although Farley retained Rahne to value the Applied Energetics stock before Farley caused the Company to issue him twenty-five million shares,[62] Farley

---

[57]     Adams Aff. Ex. 60.

[58]     Adams Aff. Ex. 66, at 1.

[59]     Adams Aff. Ex. 74.

[60]     *Id.*

[61]     Adams Aff. Ex. 6 (Farley dep.) 72:20-21.

[62]     Adams Aff. Ex. 6 (Farley dep.) 73:3-6; Adams Aff. Ex. 32.

did not wait to receive the valuation before proceeding with the issuance. After Farley received stockholder complaints challenging the issuance, however, he followed up with Rahne in an email dated April 28, 2016.[63] Despite this follow up, Farley did not receive a draft of Rahne's report until September 25, 2016.[64] In that initial draft, Rahne valued the stock on February 16, 2016, at $0.00236.[65] Farley responded to Rahne via email, "Let's talk tomorrow."[66] On September 26, 2016, Farley emailed Rahne again, stating that the "value of the shares issued on 2/16/2016 should be substantially less than $.001."[67]

Rahne issued a revised draft report on September 27, 2016.[68] In the second draft, Rahne lowered the value of the stock from $0.00236 to $0.0012.[69] The next draft of Rahne's report, dated November 16, 2016, valued the stock at $0.00135.[70] Farley responded the next day and informed Rahne, "I need the value to be $0.001

---

[63]     Adams Aff. Ex. 28.

[64]     Adams Aff. Ex. 34.

[65]     *Id.* at 3.

[66]     Adams Aff. Ex. 35.

[67]     Adams Aff. Ex. 36, at 1.

[68]     Adams Aff. Ex. 37, at 1.

[69]     *Id.* at 2.

[70]     Adams Aff. Ex. 38, at 1-2.

13

or lower."[71]  Within three hours, Rahne sent his fourth draft of his valuation report to Farley: "Attached are the revised analyses and reports with a conclusion of .001 per share."[72]  Rahne issued his final report on January 23, 2017, with a value of $0.001 per share.[73]

### F.    Applied Energetics Restarts Its Business

At the end of March 2017, Farley announced that Applied Energetics was restarting its business and had upcoming projects.[74]  The Company shed its shell status officially on April 25, 2017.[75]

Almost a year later, the Company's stockholders removed Farley from the Company's board of directors for cause, effective March 8, 2018.[76]  The stockholders listed Farley's issuance of twenty-five million shares to himself as one of the reasons for his ouster.[77]  A new three-person board replaced the old board.[78]

---

[71]    Adams Aff. Ex. 39.

[72]    Adams Aff. Ex. 40, at 1.

[73]    Adams Aff. Ex. 42.

[74]    Adams Aff. Ex. 9.

[75]    Miller Aff. Ex. 54, at 2.

[76]    Applied Energetics, Inc., Current Report (Form 8-K) 2 (Mar. 9, 2018).

[77]    Applied Energetics, Inc., Consent Statement (Schedule 14A) 1 (Feb. 2, 2018).

[78]    Applied Energetics, Inc., Current Report (Form 8-K) 2 (Mar. 9, 2018).

A stockholder, Superius Securities Group, Inc. Profit Sharing Plan ("Superius Group"), together with other stockholders, sued Farley for breach of fiduciary duty in connection with the issuance of Farley's stock.[79] The plaintiffs voluntarily requested that the Court dismiss the action, and the Court granted the request.[80]

Currently, Applied Energetics continues to develop its business, and McCahon still serves as a consultant in that endeavor.[81] The Company is raising capital through subscription agreements for stock at $0.06 per share.[82]

## II. ANALYSIS

Applied Energetics brought this litigation on July 3, 2018.[83] The parties entered into a stipulated Status Quo Order that temporarily prohibits Farley and AnneMarieCo from selling any of their shares in Applied Energetics.[84] Applied Energetics moves now for a preliminary injunction to prevent Farley and AnneMarieCo from selling their shares during the pendency of this litigation.

---

[79]   Verified Complaint 15, *Superius Securities Group, Inc. Profit Sharing Plan v. Farley*, C.A. No. 2017-0024-TMR (Del. Ch. Jan. 13, 2017).

[80]   Corrected Order, *Superius Securities Group*, C.A. No. 2017-0024-TMR (Del. Ch. Sept. 6, 2017).

[81]   Miller Aff. Ex. 5 (McCahon dep.) 7:8-12.

[82]   Pinney Decl. ¶¶ 9-12.

[83]   Compl.

[84]   Status Quo Order 2, D.I. 14.

This Court "has broad discretion in granting or denying a preliminary injunction."[85] "A preliminary injunction may be granted where the movant[] demonstrate[s]: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief."[86] "The moving party bears a considerable burden in establishing each of these necessary elements. Plaintiff[] may not merely show that a dispute exists and that plaintiff[] might be injured; rather, plaintiff[] must establish clearly each element because injunctive relief 'will never be granted unless earned.'"[87] Yet, "there is no steadfast formula for the relative weight each deserves. Accordingly, a strong demonstration as to one element may serve to overcome a marginal demonstration of another."[88]

---

[85] *Data Gen. Corp. v. Dig. Comput. Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972) (citing *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49 (Del. 1952)).

[86] *Nutzz.com, LLC v. Vertrue Inc.*, 2005 WL 1653974, at *6 (Del. Ch. July 6, 2005) (citing *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 40 (Del. 1998); *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987)).

[87] *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007) (emphasis omitted) (quoting *Lenahan v. Nat'l Comput. Analysts Corp.*, 310 A.2d 661, 664 (Del. Ch. 1973)) (citing *Thompson v. Enstar Corp.*, 509 A.2d 578, 580 (Del. Ch. 1984)).

[88] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

**A.** **Applied Energetics' Reasonable Probability of Success on the Merits at a Final Hearing**

In its Verified Complaint, the Company alleges six separate causes of action: (1) breach of fiduciary duty of loyalty against Farley, (2) breach of fiduciary duty of care against Farley, (3) aiding and abetting breach of fiduciary duty against AnneMarieCo, (4) conversion against Farley, (5) fraudulent transfer against Farley and AnneMarieCo, and (6) injunctive relief against Farley and AnneMarieCo. The Company also argues that the stock was invalidly issued under various of the Company's governing instruments. Based on the evidence currently before me, I focus on the argument that Farley invalidly issued the shares of the stock, the claim of breach of fiduciary duty of loyalty against Farley, and the claim of fraudulent transfer against Farley and AnneMarieCo.[89]

### 1. Invalid issuance under 8 *Del. C.* § 141

The Company argues that Farley caused the Company to invalidly issue twenty-five million shares to himself because Farley acted without proper board authorization.[90] "The Delaware General Corporation Law requires that the board of

---

[89]     I draw no conclusions regarding the merits of any other claim or defense.

[90]     Applied Energetics also challenges the validity of five million shares Farley caused the Company to issue because the issuance allegedly violated multiple provisions of the 2007 Stock Incentive Plan. Pl.'s Opening Br. 14-16. I do not address this argument.

17

directors of a company approve any issuance of stock by the corporation."[91] Applied Energetics' bylaws require "a majority of the total number of directors" to be present to constitute a quorum for the transaction of business at a board meeting.[92] The board members may also take action without a meeting if all members of the board sign a written consent.[93] In 2012, the Company's board reduced the number of directors from five to three.[94] The size of the board remained three members through February and March 2016. The parties have not identified any board resolution or other action that reduces the size of the board to less than three members; nor do the parties identify anything that purports to reduce the threshold for a quorum to less than a majority of the directors.

It is reasonably probable that Farley could not cause the board to validly issue stock acting as the only board member of the Company's three-member board. Stated differently, it is reasonably probable that any board action to validly issue stock, whether at a board meeting or through written consent, required the affirmative vote of at least two members of the Company's board. Only Farley

---

[91]   *Box v. Box*, 1996 WL 73575, at *8 (Del. Ch. Feb. 15, 1996) (citing 8 *Del. C.* §§ 141, 152, 153).

[92]   Defs.' Suppl. Br. Ex. C art. VII, § 3; *see also* 8 *Del. C.* § 141(b).

[93]   Defs.' Suppl. Br. Ex. C art. VII, § 4; *see also* 8 *Del. C.* § 141(f).

[94]   Applied Energetics, Inc., Current Report (Form 8-K) (July 10, 2012); McCommon Decl. Ex. 94.

18

signed the written consents dated February 15, 2016, and March 25, 2016, authorizing the issuance of twenty million and five million shares, respectively.[95] It is reasonably probable, therefore, that the twenty-five million share issuance is invalid.[96]

### 2.     Breach of fiduciary duty of loyalty against Farley

The Company also alleges that Farley breached his fiduciary duty of loyalty by awarding himself shares of stock through an unfair process at an unfair price. A plaintiff alleging a breach of fiduciary duty must show the following elements by a preponderance of the evidence: "(1) that a fiduciary duty exists; and (2) that a fiduciary breached that duty."[97] When Farley acquired the shares at issue in this

---

[95]     Adams Aff. Ex. 23; Miller Aff. Exs. 49, 51.

[96]     *See Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991); *Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143, at *10 (Del. Ch. Mar. 23, 2017) (holding that action taken at board meeting without quorum was void); *Blades v. Wisehart*, 2010 WL 4638603, at *10 (Del. Ch. Nov. 17, 2010) ("Delaware law is clear that strict compliance with statutory requirements is expected when boards change the capital structure of the corporation."), *superseded on other grounds by statute*, 72 Del. Laws ch. 72, §§ 4-5 (2013), *as recognized in In re Genelux Corp.*, 126 A.3d 644, 667-68 (Del. Ch. 2015); *Liebermann v. Frangiosa*, 844 A.2d 992, 1009 (Del. Ch. 2002); *Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *4 (Del. Ch. Nov. 27, 2001) (holding that board action is void if the written consent is not unanimous); *Viele v. Devaney*, 679 A.2d 993, 1001 (Del. Ch. 1996) (holding that action taken at board meeting without quorum was invalid); *Box*, 1996 WL 73575, at *14 (holding that shares issued at invalid board meeting are invalid).

[97]     *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002) (citing *York Lingings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999)), *aff'd*, 806

litigation, he served as the CEO and the sole director of the Company.[98] Thus, the first element is satisfied because "[o]fficers and directors of Delaware corporations owe fiduciary duties of care and loyalty to those corporations for which they serve."[99]

Here, the alleged breach of fiduciary duty centers upon Farley's grant of Company stock to himself, a self-interested transaction. "[W]hen directors make discretionary awards to themselves, that discretion must be exercised consistent with their fiduciary duties."[100] "In the absence of stockholder approval, . . . the directors must prove that the awards are entirely fair to the corporation."[101] Such discretionary "awards, if challenged, are subject to an entire fairness standard of review."[102] Under this standard of review, at trial "the burden of proof . . . rests upon the party who stands on both sides of the transaction."[103]

---

A.2d 164 (Del. 2002); *accord Zrii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009).

[98]    Applied Energetics, Inc., Annual Report (Form 10-K) 15 (Mar. 30, 2016).

[99]    *QC Commc'ns Inc. v. Quartarone*, 2014 WL 3974525, at *11 (Del. Ch. Aug. 15, 2014) (citing *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009)).

[100]    *In re Inv'rs Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1211 (Del. 2017).

[101]    *Id.*

[102]    *Id.*

[103]    *Levco Alt. Fund Ltd. v. Reader's Digest Ass'n, Inc.*, 803 A.2d 428, 2002 WL 1859064, at *2 (Del. Aug. 13, 2002) (TABLE).

> [I]n the context of a motion for a preliminary injunction, [however,] the moving party must shoulder the burden of showing a reasonable probability of ultimate success on the merits. Thus, it is not enough for plaintiff[] merely to convince me that the entire fairness standard applies and then rest. Instead, [the Company] must carry the burden of showing such a lack of fairness in the [c]hallenged [t]ransaction as to establish a reasonable likelihood that the defendants will be unable to meet their burden of proving fairness at trial.[104]

"[T]here are two components to the concept of entire fairness: fair dealing and fair price."[105] Fair dealing concerns "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[106] Fair price "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[107] Applied Energetics makes numerous arguments regarding the inadequacy of the process and price. Because Applied Energetics' arguments regarding process depend so heavily on and overlap so significantly with its arguments regarding price,

---

[104]     *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 553 (Del. Ch. 2000).

[105]     *Id.*

[106]     *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[107]     *Id.*

21

I focus on the parties' arguments in the context of discussing the allegedly unfair price.

Farley contends that the price he used to issue the shares, $0.001, is a fair price. Farley explains that in setting this price, he relied on his substantial experience in valuation, including the valuation of restricted stock.[108] Farley testified that during his career as an accountant, he had valued restricted stock at least one hundred times; as such, he was well qualified to value the issued shares.[109] In his testimony, Farley explained why he discounted the price per share from $0.004, the publicly traded share price on February 12, 2018. He reduced $0.004 by a fifty-percent marketability discount (based on the shell status of Applied Energetics) and a twenty-five-percent blockage discount (based on the low daily trading volume of the stock).[110] The result is $0.001, the price at which he issued the shares. This price is also equal to the stock's par value, as set in the Company's certificate of incorporation.[111]

As additional support for the $0.001 price, Farley points to communications he had with Stein Riso. Farley claims that these communications evidence his and

---

[108] Adams Aff. Ex. 6 (Farley dep.) 67:20-68:19, 198:5-7.

[109] *Id.* at 198:5-7.

[110] *Id.* at 67:20-68:19.

[111] Miller Aff. Ex. 93 (Certificate of Incorporation) art. FOURTH.

Stein Riso's negotiation of an arm's-length transaction that resulted in a price of $0.001.[112] Finally, Farley argues that if he undervalued the shares, the difference is justified by the amount of monetary compensation the Company has not yet paid him for his tenure as director and PEO.[113] Specifically, he argues that $0.001 is a fair price because (1) the past services he had provided to the Company before the stock issuance had a value greater than $25,000 and (2) Farley's compensation in stock, valued at $25,000, was far below the average compensation of CEOs in the Company's peer group and far below the compensation the Company's previous CEO had received.[114]

The Company disputes that the twenty-five million shares were issued at a fair price and provides evidence to show a reasonable likelihood that Farley will be unable to meet his burden of proving fairness at trial.[115] Applied Energetics asserts that (1) Farley had no independent basis for the $0.001 issue price, (2) the market and experts valued the Company's stock at higher prices, (3) Farley possessed but

[112] Defs.' Opp'n Br. 16-17.

[113] *Id.* at 57-59.

[114] Farley has asserted a counterclaim against Plaintiff for breach of contract for Applied Energetics' failure to pay at least $230,000 in compensation to Farley. I do not address the merit of this counterclaim here because the arguments that Farley raises in connection with this counterclaim do not counsel against the issuance of an injunction in this case.

[115] Pl.'s Opening Br. 39-48.

23

did not include material nonpublic information in his valuation, and (4) Farley had an obligation to issue the shares at a fair price regardless of what compensation the Company may have owed him in February 2016.

First, the Company challenges the assumptions underlying Farley's discounts to the market price. In particular, the Company argues that the discounts Farley applied are inappropriate because at the time he issued the shares, Farley was restarting the Company's business activities and planned for the Company to exit shell status.[116] Additionally, Farley had multiple avenues to remove the restrictive legend from his shares, which he knew about and explored doing.[117] Thus, the discounts are unsupported by logic or otherwise.

To further support its claim that Farley had no basis for the issue price, Applied Energetics argues that the evidence contradicts Farley's position that the share price was the result of negotiations between Farley and Stein Riso.[118] To support its argument, the Company refers to contemporaneous communications between Farley and Stein Riso. In an email exchange between Ivan Dreyer at Stein Riso and Farley, Dreyer informs Farley that the board minutes must address the share

---

[116]    Pl.'s Reply Br. 20-22.

[117]    *Id.*

[118]    Pl.'s Reply Br. 14-15.

price.[119]  In response, Farley states, "I can use par value as the price per share since it approximates [fair market value]."[120]  This exchange does not indicate any back-and-forth negotiation between Stein Riso and Farley.  A May 29, 2018 letter from Stein Riso supports Applied Energetics' argument.  In that letter, Gerard Riso, one of Stein Riso's named partners, wrote, "we [Stein Riso] were advised at the time by [Applied Energetics] that . . . the issue price per share was equal to the fair market value of the shares."[121]  This letter does not suggest that Farley and Stein Riso negotiated the price of the shares.  In fact, no contemporaneous evidence presented thus far supports Farley's contention that any negotiations occurred between Farley and Stein Riso to set the share price.[122]

Second, the Company faults Farley for assigning a below-market value of $0.001 to the shares without the opinion of a third party to support this price and suggests that Farley recognized this valuation problem as reflected in his decision to seek a third-party valuation at the time of the issuance.[123]  Farley requested a valuation from Rahne before or at the same time of the issuance, but Farley did not

---

[119]   Adams Aff. Ex. 30, at 1.

[120]   *Id.*

[121]   Adams Aff. Ex. 81, at 1.

[122]   *See* Adams Aff. Exs. 30, 69; Miller Aff. Exs. 36, 39.

[123]   Pl.'s Opening Br. 39-41.

wait on the valuation to issue the shares.[124] Further, the initial draft of Rahne's valuation dated September 25, 2016, calculated a share price of $0.00236.[125] When Farley received the valuation, he told Rahne that he (Farley) wanted to talk to Rahne about the valuation.[126] Rahne issued an updated valuation two days later with a new share price of $0.0012.[127] A third draft two months later reflected a share price of $0.00135.[128] In response to this valuation, Farley informed Rahne that Farley "need[ed] the value to be $0.001 or lower."[129] Less than three hours later, Rahne sent a fourth draft of the valuation—with a share price of exactly $0.001.[130] The fifth and final version of Rahne's report also showed a share price of $0.001.[131]

The Company even points to Defendants' own litigation expert's report as evidence that Farley's price was not fair.[132] During the pendency of this litigation,

---

[124] *Compare* Adams Aff. Exs. 11, 23, *with* Adams Aff. Ex. 28.

[125] Adams Aff. Ex. 34, at 3.

[126] Adams Aff. Ex. 35.

[127] Adams Aff. Ex. 37, at 1-2.

[128] Adams Aff. Ex. 38, at 1-2.

[129] Adams Aff. Ex. 39.

[130] Adams Aff. Ex. 40, at 1, 3.

[131] Adams Aff. Ex. 42, at 2.

[132] Pl.'s Opening Br. 29.

Defendants hired a valuation expert. The expert report dated October 18, 2018, values the shares at $0.00187 per share.[133] This expert report, the market where the stock traded, and the first three drafts of Rahne's valuation report each value the shares above the price Farley chose, $0.001.

Third, the Company argues that Farley failed to factor material nonpublic information into the issue price. The Company asserts that Farley was aware the share price would likely increase after the Company restarted its business activities and left shell status.[134] Farley had found prospective deals to use the Company's technology and was working toward definitive agreements with other companies.[135] Farley had been in discussions with McCahon regarding a consulting agreement, leading to a signed agreement on February 23, 2018.[136] The Company argues that Farley should have included his knowledge of the Company's potential future activities in his calculation of the share price.[137]

Fourth and finally, the Company argues that regardless of whether the Company owes Farley any amount for past compensation, Farley had an obligation

---

[133] Adams Aff. Ex. 47, at 39.

[134] Pl.'s Opening Br. 44-45.

[135] Farley Decl. ¶¶ 22-23, 26-30.

[136] Adams Aff. Ex. 6 (Farley dep.) 65:18-23; Adams Aff. Ex. 10.

[137] Pl.'s Opening Br. 44-45.

to issue the stock at a fair price.[138]  It is premature to resolve Farley's counterclaims regarding his compensation at this stage of the litigation.  Nonetheless, Farley's compensation is not instrumental to the valuation of the issuing price for Farley's twenty-five million shares.   His arguments relating to compensation do not counsel against issuance of an injunction because Farley's compensation does not limit Farley's duty of loyalty to the Company.

The evidence Applied Energetics presents sufficiently shows a reasonable likelihood that Farley will be unable to meet his burden at trial of proving that the share issuance was entirely fair.[139]  Applied Energetics, therefore, has met its burden to show a reasonable probability of success on the merits in its claim against Farley for breach of the fiduciary duty of loyalty.

### 3.    Fraudulent transfer against Farley and AnneMarieCo

Plaintiff claims that Farley and AnneMarieCo violated the Delaware Uniform Fraudulent Transfer Act (the "Act").[140]  Under this Act,

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or

---

[138]    *Id.* at 45-46.

[139]    Because the claim for breach of fiduciary duty of loyalty is sufficient to support a preliminary injunction against Farley individually, I need not address the other counts against him.

[140]    6 *Del. C.* §§ 1301-1312.

28

incurred the obligation:  (1) [w]ith actual intent to hinder, delay or defraud any creditor of the debtor . . . .[141]

To determine actual intent, courts consider the factors listed in 6 *Del. C.* § 1304(b), which include, among others, whether the transfer was to an insider, whether the debtor retained control of the property transferred after the transfer, whether the transfer was disclosed or concealed, and whether the debtor had been sued or threatened with suit before the transfer was made.  "[I]t is the law in Delaware . . . that where a transaction alleged to be fraudulent takes place between persons of near blood relationship, it will be more closely scrutinized than if it were between strangers, because where such intimacy of relationship exists fraud is easily practiced and effectively concealed."[142]

Farley does not dispute that he is a debtor of creditor Applied Energetics because Applied Energetics has claims against Farley.  Nor does he dispute that the conduct giving rise to the Company's claims against Farley occurred before the transfer of stock from Farley to AnneMarieCo.  Instead, Farley argues there is no evidence of actual intent to defraud the Company.  Farley explains that he transferred

---

[141]     6 *Del. C.* § 1304(a)(1).

[142]     *United States v. West*, 299 F. Supp. 661, 664 (D. Del. 1969); *see also Cooch v. Grier*, 59 A.2d 282, 287 (Del. Ch. 1948) (citing *Richards v. Jones*, 142 A. 832, 835 (Del. Ch. 1928)).

the stock to AnneMarieCo as part of his estate planning, which he had done in the past.[143]  The evidence presented thus far, however, suggests otherwise.

First, although AnneMarieCo is not an insider under the explicit language of the Act, Section 1310 of the Act allows me to treat AnneMarieCo as an insider because Farley's wife and children wholly own and manage AnneMarieCo.[144]

Second, the Company points to sufficient evidence to show at this stage that Farley retained control of the Applied Energetics stock.[145]  For example, he wrote an email to his son Thomas with instructions on how to sell the shares.[146]  He not only instructs Thomas how AnneMarieCo should sell the shares, but he drafts the email for Thomas, writing, "Tom[,] Please respond to michael's [*sic*] email as

---

[143]    Farley Decl. ¶¶ 90-92; *see* Miller Aff. Ex. 1 (Capital Gains and Losses for 2006, 2007, and 2008).

[144]    *See* 6 *Del. C.* § 1310 ("Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency or other validating or invalidating cause, supplement its provisions.").  The definition of "relative" in 6 *Del. C.* § 1301(11) includes spouses and children.

[145]    *See, e.g.*, Adams Aff. Exs. 52, 74.

[146]    Adams Aff. Ex. 74.

follows."[147] The rest of the email is Farley's text for Thomas to send to Michael Mullings at Continental.[148]

Third, the Company points to sufficient evidence to show at this stage that Farley concealed the transfer when he failed to initially disclose the material relationship between him and AnneMarieCo in the Company's April 27, 2017 disclosure filing.[149] In its May 24, 2017 correspondence to Applied Energetics, the SEC requested that Applied Energetics amend its filing to disclose any material relationships between AnneMarieCo and Farley.[150] Not until October 31, 2017, after two more letters from the SEC, did Applied Energetics disclose the relationship between Farley and AnneMarieCo.[151] The disclosure, however, fails to state that Farley's wife owns an interest in AnneMarieCo or that the registered agent address for AnneMarieCo is Farley's residence.[152]

Fourth and finally, the Company points to sufficient evidence to show at this stage that Farley knew there was a threat of litigation when he received complaints

---

[147]   *Id.*

[148]   *Id.*

[149]   Pl.'s Opening Br. 22-25.

[150]   *See* Adams Aff. Ex. 54, at 2.

[151]   Adams Aff. Ex. 60.

[152]   *Id.*

from stockholders in connection with the issuance of shares to himself.[153] He had a discussion with Jim Hudgins in April 2016.[154] Hudgins is the CEO of the Superius Group, a stockholder of Applied Energetics.[155] Hudgins told Farley multiple times that he (Hudgins) was troubled by the transaction.[156] Superius Group subsequently filed litigation against Farley.[157]

These facts, when viewed together, provide sufficient evidence at this stage of the Defendants' alleged intent to defraud Applied Energetics and its stockholders. Applied Energetics provides sufficient evidence to show a reasonable probability of success on the merits in its claim of fraudulent transfer against Farley and AnneMarieCo.[158]

---

[153]  Pl.'s Opening Br. 57-58.

[154]  Hudgins Decl. ¶ 5.

[155]  *Id.* ¶ 1.

[156]  *Id.* ¶¶ 6-7.

[157]  Verified Complaint, *Superius Securities Group, Inc. Profit Sharing Plan v. Farley*, C.A. No. 2017-0024-TMR (Del. Ch. Jan. 13, 2017).

[158]  Farley asserts numerous defenses: (1) the Company is unable to show it suffered any damages resulting from Farley's conduct, (2) it is inequitable for the Applied Energetics' current board of directors to pursue this action against Defendants because the current directors issued themselves stock as compensation at a discount thirty-seven percent below market price, and (3) Applied Energetics' motivation in pursuing this action is to "financially ruin" Farley. Defs.' Opp'n Br. 61-65. I express no opinion at this time regarding whether Farley may ultimately prevail on any of these defenses, but none of them counsels against the issuance of an injunction preventing the sale of the shares during the pendency of this litigation.

## B. Imminent Threat of Irreparable Harm

"Harm is irreparable unless 'alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'"[159] Applied Energetics argues that it will be irreparably harmed if the Court does not issue a preliminary injunction because Farley and AnneMarieCo would likely flood the market with invalidly issued shares, causing serious business harm to the Company, including an inability to raise capital and potential bankruptcy.[160] Applied Energetics' current funds are insufficient to fully restart its business operations, and the Company is raising additional capital through stock subscription agreements.[161] Applied Energetics claims that public knowledge that Farley and AnneMarieCo are selling their twenty-five million shares will cause demand for Company stock subscriptions to dwindle, making it much more difficult for the Company to raise capital.[162] The Company argues that without this much-needed capital, the Company will be unable to pursue business opportunities by expanding its research and development program and creating products for the

---

[159] *Destra Targeted Income Unit Inv. Tr. v. Parmar*, 2017 WL 373207, at *2 (Del. Ch. Jan. 25, 2017) (alterations in original) (quoting *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000)).

[160] Pl.'s Opening Br. 60.

[161] *Id.* at 59.

[162] *Id.* at 60.

Department of Defense and commercial partners.[163] Applied Energetics claims that an inability to raise sufficient capital, combined with the loss of business opportunities, could lead to bankruptcy for the Company.

Applied Energetics stock is not heavily traded. Over the past year, the average daily trading volume is approximately 150,000 shares.[164] On dozens of days, the daily trading volume was less than 20,000 shares. Although Defendants have testified that they intend to sell one million shares each at a rate of 10,000 shares each per day,[165] absent an injunction, nothing prevents Defendants from dumping many more shares on the market.

Defendants do not seriously dispute that flooding the market with their shares would cause the harm the Company fears. Instead, Defendants offer three responses to rebut the Company's arguments. First, Defendants point to other individuals and entities to whom Farley issued stock. Farley and AnneMarieCo contend that these stockholders present a similar danger of flooding the market by selling their stock.[166] This argument is unconvincing because both Farley and AnneMarieCo have stated

---

[163]    *Id.* at 61-62.

[164]    The average daily trading volume for the period January 1, 2018, through December 31, 2018, is 150,349.5.

[165]    Adams Aff. Ex. 6 (Farley dep.) 193:20-24; Adams Aff. Ex. 50 (T. Farley dep.) 52:25-54:4.

[166]    Defs.' Opp'n Br. 74-75.

their intentions to sell at least a substantial portion of their shares, but neither Stein Riso, McCommon, Rahne, nor Fettig has sought to remove the restrictive legend or expressed any intent to sell any shares. Stein Riso has agreed not to transfer their disputed shares while the Company and Stein Riso work toward a resolution.[167] In June 2018, McCommon inquired with Applied Energetics' counsel about removing the restrictive legend.[168] After he learned that the then-CEO of Applied Energetics would not like McCommon attempting to remove the legend, McCommon abandoned the idea and has made no further attempts since then.[169] Applied Energetics is not aware of any attempt by Rahne to remove the restrictive legend from his one million shares. Fettig returned his disputed shares to the Company. McCahon has inquired about removing the restrictive legend from his shares at a rate of 100 shares per month.[170] Applied Energetics, however, is not aware of any attempt by these stockholders to actually remove the restrictive legend and sell any disputed shares; if the Company does become of aware of such an attempt, the Company will pursue legal action to prevent it.[171]

---

[167]    Adams Aff. Ex. 81, at 2.

[168]    Miller Aff. Ex. 4 (McCommon dep.) 50:7-19.

[169]    *Id.* at 51:3-53:8.

[170]    Miller Aff. Ex. 89.

[171]    Oral Arg. Tr. 100:1-14.

Second, Defendants contest Plaintiff's argument that it will be unable to raise capital absent an injunction. Defendants note that the Company raised capital in April and May 2018 with no injunction in place.[172] Defendants further point out that the stock price dropped after the TRO was entered.[173] Defendants' arguments ignore the fact that restrictive legends prevented them from flooding the market with their shares in April and May 2018. Defendants also misstate Plaintiff's argument in support of the preliminary injunction. Plaintiff does not argue that the preliminary injunction will cause an increase in the stock price; it argues that the Defendants would cause the stock price to crater by flooding the market with otherwise unavailable shares.[174] Defendants do not seriously contest this argument or that flooding the market, in conjunction with the Company's current financial position, may cause bankruptcy.

Third and finally, Defendants claim they are aligned with stockholders and have no interest in dumping their shares. These arguments, however, ignore that the Company seeks the cancellation or equitable rescission of Defendants' shares.[175] The possibility of such a result may encourage Defendants to sell their shares as

---

[172] Defs.' Opp'n Br. 77.

[173] *Id.*

[174] Pl.'s Opening Br. 59-60.

[175] Compl. 39.

quickly as possible. Without an injunction, nothing would prevent Defendants from doing so.

Defendants also ignore the impact their collective ownership of approximately one eighth of the Company's outstanding shares may have.[176] This substantial level of ownership increases the magnitude of any action the Defendants may take, such as selling their shares. The questionable status of the shares has an increased impact on the Company's ability to run its business activities. The uncertainty of the capital structure of the Company impacts any action the Company takes requiring stockholder approval. This uncertainty also impacts the Company's ability to raise capital. Without the ability to offer investors certainty regarding the validity of stockholder action or their percentage of ownership, the Company will have difficulty attracting investors and raising capital. Difficulty raising capital, combined with the Company's current financial position, could lead to bankruptcy.

Plaintiff's contentions are sufficient to warrant a finding of irreparable harm.

## C.    Balance of the Equities

"[I]n evaluating the need for a preliminary injunction, the Court must balance the plaintiff's need for protection against any harm that can reasonably be expected

---

[176]    "As of November 8, 2018, there were 198,697,396 shares of the issuer's common stock . . . outstanding."  Applied Energetics, Inc., Quarterly Report (Form 10-Q) 1 (Nov. 11, 2018).

to befall the defendants if the injunction is granted. When the former outweighs the latter, then the injunction should issue."[177]

The harm Plaintiff may suffer in the absence of a preliminary injunction includes an inability to restart its business and possible bankruptcy. If I enjoin Defendants from selling their stock during the pendency of this litigation, I will prevent them from realizing the profit of any sale of that stock. This loss of profit can be remedied, if appropriate, by the bond Plaintiff must post. Because no such protection exists for Applied Energetics, I conclude that the balance of the equities tips in favor of the Plaintiff.

## III. BOND

In the letter opinion dated August 14, 2018, I set the bond by (1) calculating the difference between $0.14 and the average intraday low price of the stock for the period July 5, 2018, through August 10, 2018, and then (2) multiplying that difference by the number of shares Defendants could theoretically sell. The bond is currently set at $441,194.90.[178] Defendants request that I adjust the bond amount by updating the average intraday low price.[179] The average intraday low price from July

---

[177]    *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1269, 1278-79 (Del. 1989).

[178]    Sum of the August 14 bond ($200,446.52), the August 23 increase ($55,446.52), and the October 17 increase ($185,301.86).

[179]    Defs.' Opp'n Br. 83.

5, 2018, through January 22, 2019, is $0.074. The difference between $0.14 (the price on July 5, 2018) and $0.074 is $0.066. Updating the bond as Defendants request, the new bond amount would be $252,377.26 for AnneMarieCo and $330,000.00 for Farley.

Plaintiff makes several arguments to lower the amount of the bond. First, Plaintiff argues that because Farley and AnneMarieCo both stated that they will limit their sale of shares to one million shares, that the bond should be calculated on a total of two million shares.[180] Neither party points to anything that legally prevents either Defendant from selling more than one million shares. I, therefore, will not limit their damages to calculations based on this limitation.

Second, Plaintiff argues that reducing the amount of the bond will likely cause the stock price to go up.[181] This assertion is speculation. Even so, if Plaintiff is correct and the stock price goes up, Defendants cannot benefit from the increased stock price when they are enjoined from selling their shares.

Third and finally, Plaintiff argues that because Farley is closely related to the members and managers of AnneMarieCo, I should apply the sales restriction of SEC Rule 144 to Farley and AnneMarieCo collectively.[182] Plaintiff does not explain why,

---

[180]     Pl.'s Opening Br. 65.

[181]     *Id.*

[182]     *Id.* at 65-66.

given the passage of time, Farley would still be an "affiliate" of the Company for purposes of Rule 144.[183] Because Farley is, at least arguably, no longer an affiliate of the Company, I err on the high side and do not apply the sales restriction of SEC Rule 144 to Farley and AnneMarieCo collectively.

None of Plaintiff's arguments persuade me to lower the bond amount. I, therefore, calculate the bond as Defendants request, resulting in $252,377.26 for AnneMarieCo and $330,000.00 for Farley.

## IV. CONCLUSION

For the foregoing reasons, I grant Plaintiff's Motion for Preliminary Injunction. Plaintiff shall increase the current bond of $441,194.90 by $141,182.36 within five days after entry of this opinion.

**IT IS SO ORDERED**.

---

[183] *See* 17 C.F.R. § 230.144(b)(1)(i).