**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

June 1, 2023

Stephen E. Jenkins, Esquire
Tiffany Geyer Lydon, Esquire
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

Francis G.X. Pileggi, Esquire
Aimee M. Czachorowski, Esquire
Lewis Brisbois Bisgaard & Smith LLP
500 Delaware Avenue, Suite 700
Wilmington, DE 19801

Jody C. Barillare, Esquire
Morgan, Lewis & Bockius LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801

RE:  *Knight v. Miller, et al., and Universal Health Services, Inc.*,
C.A. No. 2021-0581-LWW

Dear Counsel:

I write regarding the proposed settlement of this derivative action challenging equity grants awarded to directors and officers of Universal Health Services, Inc. After a careful review of the record, I conclude that the proposed settlement is inadequate and decline to approve it. My reasoning follows.

## I. BACKGROUND

The following facts are drawn from the Verified Stockholder Derivative Complaint (the "Complaint") and documents it incorporates by reference (including those produced to the plaintiff pursuant to 8 *Del. C.* § 220), the parties' motion to

dismiss briefing, the court's April 27, 2022 Memorandum Opinion denying the motion to dismiss in part, various submissions made in connection with the proposed settlement, and the settlement hearing transcript.[1] I am not making findings of fact in this decision. Instead, I am reciting the record as it was presented for the purpose of evaluating the parties' request for approval of their settlement.

### A. The Awards

The plaintiff in this action is a purported stockholder of nominal defendant Universal Health Services, Inc. (the "Company" or "UHS"). She challenges grants of equity compensation (the "Awards") made to directors and officers of the Company amid COVID-19-related market volatility in mid-March 2020.

The plaintiff alleges that, despite the abnormal macroeconomic conditions, the Compensation Committee of the Company's Board of Directors proceeded with a March 18, 2020 meeting concerning the Awards.[2] The timing of that meeting was fixed about six months in advance.[3] The Company's stock option grants had historically (with one exception) been made during meetings held in March.[4] Still,

---

[1] *See* Verified S'holder Deriv. Compl. (Dkt. 1) ("Compl."); Mem. Op. (Dkt. 37); Tr. of Dec. 15, 2022 Telephonic Settlement Hr'g (Dkt. 68) ("Hr'g Tr.").

[2] Compl. ¶¶ 68, 71; Mem. Op. 10.

[3] Mem. Op. 8-9.

[4] *Id.* at 9.

the plaintiff averred that the Compensation Committee treated the option grant process in March 2020 as though it "were any other normal year when it manifestly was not."[5]

The March 18 Compensation Committee meeting began before the market opened for trading.[6]  The Compensation Committee invited non-independent director Warren Nimetz to attend the meeting.[7]  The meeting was also attended by the Company's outside compensation consultants, who delivered a presentation and made a recommendation regarding the Awards and comparisons to the Company's "peer group."[8]

After the consultants left the meeting, alleged controller defendant Alan Miller and UHS Chief Financial Officer Steve Filton joined the Compensation Committee "and the members discussed performance bonuses for executive officers."[9]  The Compensation Committee "decided to defer any discussion or approval of the specific bonus formulae . . . for the Company's executive officers [in

---

[5] *See id.* at 10 (quoting Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Verified S'holder Deriv. Compl. (Dkt. 24) at 8).

[6] Compl. ¶ 68.

[7] *Id.* ¶ 69 (noting that Nimetz was not a member of the Compensation Committee).

[8] *Id*. ¶¶ 70, 77.

[9] Mem. Op. 11 (citing Compl. ¶ 70; Opening Br. in Supp. of Defs.' Mot. to Dismiss Verified S'holder Deriv. Compl. (Dkt. 20) ("MTD Opening Br.") Ex. F at 2).

fiscal year 2020] given the significant uncertainties created by the recent emergence of the Covid-19 crisis."[10]

The Compensation Committee then discussed recommended stock option grants, "presumably still in the presence of Nimetz and Alan Miller."[11] The members "reviewed the previously distributed recommendations of management as to the grant of stock options and 'premium priced' stock options to the senior executives," and passed a resolution to grant the Awards.[12] Over one million options and restricted stock units were granted to the Company's officers and directors, with over 750,000 options going to the Company's controllers Alan Miller and Marc Miller.[13] "The resolution adopted by the Compensation Committee purport[ed] to specify the closing sale price of the common stock as the strike price of the stock options, though it would not be determined until later that day."[14]

UHS common stock closed at $67.69 per share on March 18, which was 16% lower than the closing price the prior day.[15] The next day—when the federal

---

[10] MTD Opening Br. Ex. F at 2; *see also* Mem. Op. 11.

[11] Mem. Op. 11.

[12] *Id.* (quoting MTD Opening Br. Ex. F at 2).

[13] Compl. ¶ 72.

[14] Mem. Op. 11.

[15] Compl. ¶ 71. UHS stock had traded between approximately $124 and $148 per share throughout the previous three months. *Id.* ¶ 28.

government's second phase coronavirus relief legislation passed—the market improved and the Company's stock price rose 25%.[16]  By the time the third phase was signed into law on March 30, the Company's stock price closed at $100.13.[17]

## B.    The Litigation

On July 6, 2021, the plaintiff filed the Complaint against various UHS directors and officers.  She advanced a breach of fiduciary duty claim against the Compensation Committee for granting the Awards, a breach of fiduciary duty claim against all defendants for accepting the Awards, an unjust enrichment claim, and a corporate waste claim.[18]  The plaintiff asserted that making a pre-suit demand would have been futile because the Board received a material financial benefit from the Awards and faced a substantial likelihood of personal liability for breaching their duties of loyalty.[19]  The defendants subsequently moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6), arguing that the price and process relating to the equity grants were entirely fair.[20]

---

[16] *Id.* ¶ 74.

[17] *Id.* ¶ 75 ("This was 47% above the March 18 grant price of $67.69.").

[18] *See id.* ¶¶ 114-28.

[19] *See id.* ¶¶ 104-13.

[20] MTD Opening Br. 23-24.

On April 27, 2022, Vice Chancellor Glasscock issued a Memorandum Opinion on the motion. The court largely declined to dismiss the breach of fiduciary duty claim against the Compensation Committee for granting the Awards.[21] By granting the Awards to the Company's outside directors—including themselves—it was reasonably conceivable that the Compensation Committee members undertook a self-interested compensation decision subject to the entire fairness standard of review.[22] Although the Company's stockholders had approved a stock incentive plan pursuant to which the Awards were issued, the plan allowed for significant Compensation Committee discretion.[23] The facts pleaded to indicate a lack of fairness were "not overwhelming" but "sufficient" to survive a Rule 12(b)(6) motion.[24] As to the Compensation Committee approving grants to UHS's controlling stockholders, entire fairness likewise applied given the controllers' "ability to elect directors" and receipt of non-ratable benefits.[25]

The court also denied the defendants' motion to dismiss the unjust enrichment claim.[26] Since the court dismissed the fiduciary duty claims against all defendants

---

[21] Mem. Op. 34-35.

[22] *Id.* at 21 (citing *In re Investors Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208 (Del. 2017)).

[23] *Id.* at 22-23 (citing *Investors Bancorp*, 177 A.3d at 1222).

[24] *Id.* at 24-25.

[25] *Id.* at 26-27.

[26] *Id.* at 33-34.

except for the Compensation Committee members, the unjust enrichment claim was not "truly duplicative" of the remaining breach of fiduciary duty claim.[27]

The defendants' motion to dismiss was otherwise granted.

## C. The Settlement

The defendants answered the Complaint on May 27, 2022.[28] The plaintiffs went on to serve requests for production and interrogatories on the defendants, and the individual defendants served requests for production on the plaintiff.[29] "As the parties began to take discovery, they started to discuss a framework to address the issues raised in the Complaint without the need for uncertain and expensive litigation."[30] Settlement talks began on June 9.[31]

The parties reached a proposed settlement on August 26 and entered into a memorandum of understanding.[32] The defendants agreed to adopt "a package of targeted governance reforms designed to strengthen controls over the Company's

---

[27] *Id.*

[28] *See* Dkts. 43-45.

[29] *See* Dkts. 52-53.

[30] *See* Pl.'s Appl. for Approval of the Settlement, an Award of Att'ys' Fees and Expenses, and the Pl.'s Serv. Award (Dkt. 58) ("Pl.'s Settlement Br.") 8.

[31] *Id.*

[32] *Id.* at 8-9.

compensation practices and prevent a recurrence of the alleged misconduct."[33]

These "reforms," as detailed in the parties' Stipulation and Agreement of Settlement

(the "Stipulation"), included the following:[34]

- <u>Changes to the Individual Defendants' Stock-Based Compensation</u>. The Compensation Committee decreased the weighting of stock-based compensation to the Company's top five executive officers and outside directors with an accompanying increase in the weighting of cash compensation. These individuals began receiving stock-based compensation "in a fixed dollar value rather than in a fixed number of shares" starting in March 2022.[35] The executive officers also began to receive 50% of their annual stock-based compensation in performance-based restricted stock units rather than in stock options.[36] Additionally, the Compensation Committee eliminated the award of stock options with five-year vesting to compensate the outside director defendants, and now awards restricted stock units that vest in one year installments.[37] I refer to this category of governance enhancements as the "Stock-Based Compensation Changes."

- <u>Fixed Award Date for Stock-Based Compensation</u>. The Compensation Committee "decided" to fix the annual grant date for the outside directors' stock-based compensation to the date of the annual May Board meeting held after the annual meeting of stockholders, subject to certain exceptions.[38] The individual defendants also agreed that any future changes to this date would be disclosed to stockholders.[39] I refer

---

[33] *Id.* at 9.

[34] Stip. and Agreement of Settlement (Dkt. 54) ("Stip."). I refer to the terms of Exhibit A to the Stipulation for a complete description of these so-called reforms.

[35] Stip. Ex. A at 2-3.

[36] *Id.* at 3.

[37] *Id.* at 4.

[38] *Id.* at 5.

[39] *Id.*

to this category of governance enhancements as the "Fixed Award Date Changes."

- Compensation Committee Executive Session. The Compensation Committee's "principal deliberations" about Alan Miller or Marc Miller's compensation will be held in executive session.[40] But the Compensation Committee is not prohibited from "any incidental discussion of, or taking any formal action concerning, such compensation outside of executive session, nor from discussing or negotiating compensation with Alan Miller or Marc Miller."[41] I refer to this governance enhancement as the "Executive Session Change."

- Compensation Committee Training. The Compensation Committee will "receive training from the Company's outside counsel or an independent consultant," which can include previously engaged counsel or consultants, "regarding the laws and regulations governing the Company's current stock incentive plan and other compensation plans."[42] I refer to this governance enhancement as the "Training."

- Outside Advisor Process Review. The Compensation Committee will "engage outside counsel or an independent consultant," which can include previously engaged counsel or consultants, "to review the process by which the Committee grants stock options or other equity awards."[43] The results of this review will be presented to the Compensation Committee. I review to this governance enhancement as the "Process Review."

- Review of Changes to Stock-Based Compensation Policies. The Company's in-house or outside counsel will review and advise the Compensation Committee on any changes proposed or made to the Company's policies and procedures about the award of stock-based

---

[40] *Id.*

[41] *Id.* at 6.

[42] *Id.*

[43] *Id.* at 6-7.

compensation.[44]  I refer to this governance enhancement as the "Policy Review."

- <u>Review of Public Disclosures</u>.  The Compensation Committee—either separately or with the full Board—will "review the Company's proxy statements and Form 8-K disclosures relating to executive or director compensation prior to filing."[45]  The directors will be assisted by "outside counsel or independent consultants," "as they deem necessary."[46]  I refer to this governance enhancement as the "Disclosure Review."

The Stipulation was filed with the court on September 28, 2022.  In addition to the governance enhancements discussed above, the Stipulation explained that the parties bargained for a release of claims relating to the matters raised in the Complaint and the underlying Section 220 demand.[47]  The Stipulation further stated that the defendants and Company agreed not to oppose the plaintiff's counsel's application for an award of fees and expenses of $925,000.[48]

On September 29, the court entered a scheduling order with respect to notice and a settlement hearing.[49]  A settlement hearing was held on December 15.  At the hearing, Vice Chancellor Glasscock expressed concern that the settlement amounted

---

[44] *Id.* at 7.

[45] *Id.*

[46] *Id.*

[47] *See* Stip. ¶ 1(j)-(q).

[48] *Id.* ¶ 13.

[49] Dkt. 55.

to "a handful of nothing."[50] The court took the parties' request to approve the settlement under advisement. The plaintiff's counsel noted that they would be willing to "serv[e] discovery" and "continue to litigate the case."[51]

The court "strongly suggest[ed]" that the parties "talk about whether there is something more tangible that can be done in the way of corporate governance."[52] Two letters from counsel followed. First, the defendants' counsel told the court that the defendants would be willing to supplement the Process Review to require that the Compensation Committee adopt any process-related recommendations made, unless doing so was deemed not in the best interest of the Company or its stockholders.[53] Next, the plaintiff's counsel informed the court that the plaintiff was "unable to join Defendants in submitting" the supplemental Process Review provision for the court's review.[54] The plaintiff proposed recommencing the litigation if the court concluded that the proposed settlement was unsatisfactory.[55]

---

[50] Hr'g Tr. 36.

[51] *Id.* at 41-42.

[52] *Id.* at 42.

[53] *See* Dkt. 67 at 3.

[54] Dkt. 69 at 1.

[55] *Id.* at 3. The letter also indicated that the court could consider the additional term proposed by the defendants in assessing the overall reasonableness of the settlement, despite declining to join the defendants in proposing it. *Id.* After these letters were filed, the action was reassigned to me. Dkt. 70.

## II.    ANALYSIS

Court of Chancery Rule 23.1(c) requires court approval of the dismissal or settlement of derivative actions.[56]  The court must determine whether the settlement is "fair and reasonable," exercising "a form of business judgment to determine the overall reasonableness of the settlement."[57]  The court is to "consider the nature of the claim, the possible defenses thereto, [and] the legal and factual circumstances of the case, and then . . . apply its own business judgment in deciding whether the settlement is reasonable in light of these factors."[58]  In doing so, the court must carefully scrutinize "the reasonableness of the 'give' and the 'get'"—that is, what the nominal defendant received "in exchange for ending the litigation."[59]

### A.    The "Get"

The plaintiff's brief in support of the settlement argues that she achieved significant benefits for the Company in the form of the Stock-Based Compensation Changes and the Fixed Award Date Changes.[60]  The Stock-Based Compensation

---

[56] Ct. Ch. R. 23.1(c).

[57] *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986).

[58] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1284 (Del. 1989) (quoting *Polk*, 507 A.2d at 535).

[59] *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 891 (Del. Ch. 2016) (addressing a putative class action settlement).

[60] *See* Pl.'s Settlement Br. 15-17.

Changes were purportedly intended to address the plaintiff's assertion that awarding equity compensation with a value based on grant-date market prices may result in an unearned windfall if UHS's stock price increases shortly after the grant date.[61] The Fixed Award Date Changes were purportedly designed to eliminate the directors' discretion concerning the grant date of the defendants' stock-based compensation and ensure that stockholders have an opportunity to be heard before any such compensation is granted.[62]

These categories of enhancements might arguably have provided some tangible (albeit modest) benefits to the nominal defendant. But they were implemented well before the settlement was reached.[63]

---

[61] *See* Compl. ¶¶ 76-77.

[62] Pl.'s Settlement Br. 17-18.

[63] Stip. Ex. A at 1-5 (describing changes already undertaken: "[t]he Compensation Committee has decreased the weighting of stock-based compensation . . ."; "commencing in March 2022, each of the Executive Officer Defendants began receiving stock-based compensation denominated in a fixed dollar value . . ."; "the Executive Officer Defendants now receive 50% of their annual stock-based compensation not in stock options . . ."; "[t]he Compensation Committee has likewise decreased the weighting of stock-based compensation to individual Defendants . . ."; "commencing in 2022, each Outside Director Defendant began receiving stock-based compensation denominated in a fixed dollar value . . ."; "the Compensation Committee decided to fix the annual grant date for the Outside Director Defendants' stock-based compensation to the date of the Board of Directors' meeting held in May"); *see supra* notes 35-46 and accompanying text; *see also* Universal Health Servs., Inc. Schedule 14A (Apr. 6, 2022) at 57-58 (describing changes to director compensation undertaken by the Compensation Committee and Board in March 2022).

The plaintiff's counsel maintains that these governance enhancements were undertaken by the Board because of the lawsuit.[64] That may well be true. And the defendants' counsel, for their part, avers that the Board was mindful of the issues raised by the lawsuit and did not "want to wait" to make improvements.[65] I do not doubt it. Insofar as these changes were caused by the lawsuit, they might support a mootness fee. They are not, however, present consideration for a settlement. To treat them as such would deprive the court of its "important oversight role" in approving derivative settlements.[66]

That leaves the remaining enhancements, which Vice Chancellor Glasscock observed were "largely precatory."[67] I agree.

The Executive Session Change, which ensures the "principal deliberations" on the controllers' compensation are made outside of their presence, seems to be the

---

[64] Hr'g Tr. 31.

[65] *Id.* at 32.

[66] *Barkan*, 567 A.2d at 1284 (explaining the general rule that settlements cannot be approved without present consideration); *see also Chickering v. Giles*, 270 A.2d 373, 375 (Del. Ch. 1970) (declining to approve a settlement the parties implemented before the court had an opportunity to rule on its fairness and observing than an exception might be present if the parties were "faced with an emergency or facts which compel action before the Court can give notice or hold a hearing on a settlement petition"). I see no basis to make an exception to this general rule.

[67] Hr'g Tr. 30.

most considerable.[68]  It provides for baseline good governance.  But it is heavily qualified and makes explicit that "incidental discussion[s]" and "formal action" about the controllers' compensation can occur outside of an executive session.[69]  The Executive Session Change does little to remove the potential for influence by the controllers, despite this being a pervasive theme described in the Complaint and in the court's Memorandum Opinion.

The other enhancements—the Training, Process Review, Policy Review, and Disclosure Review—are trifling.  The Compensation Committee met with outside compensation consultants before setting the challenged Awards.[70]  The Process Review does not seem to require a markedly different process.  For example, the Compensation Committee is not required to follow the advice of the outside counsel or consultant (subject to its fiduciary duties, of course).  It is also not apparent to me that the Policy Review requires any changes from the Compensation Committee's prior process.  One would expect that Company counsel was already reviewing proposed changes to UHS's stock-based compensation policies and procedures.  As to the Disclosure Review, the Board members have an enduring obligation to review certain compensation-related disclosures.  Despite acknowledging this, the

---

[68] Stip. Ex. A at 6.

[69] *Id.*

[70] Compl. ¶¶ 70, 77.

plaintiff's counsel believes that the settlement will make the directors "more diligent" in performing this task.[71]

As I previously noted, the defendants proposed a favorable change to the Process Review after the settlement hearing.[72] The plaintiff was "unable to join Defendants in submitting [the] provision to the court."[73] Because there has been no meeting of the minds on an amended settlement, I must limit my analysis to the terms of the initial settlement presented.

## B.    The "Give"

In exchange for the governance enhancements (i.e., those not adopted pre-settlement), the plaintiff agreed to dismiss this action and to a release of claims. The Stipulation defines the "Released Plaintiff's Claims" as "claims, rights, duties, controversies" and the like—whether known or unknown—that:

> (i) were or could have been asserted by the Company, or by Plaintiff or any other UHS Stockholder derivatively on the Company's behalf, and (ii) arise out of or relate to the allegations, transactions, facts, matters, disclosures, or non-disclosures set forth in the Complaint filed in the Action or in Plaintiff's January 11, 2021 inspection demand, or that arise out of or relate in any way to the defense or settlement of the claims against Defendants, except for claims relating to the enforcement of the Stipulation.[74]

---

[71] Hr'g Tr. 28-29.

[72] *See* Dkt. 67.

[73] Dkt. 69.

[74] Stip. ¶ 1(n).

The plaintiff's claims were not especially strong and were found to be viable in no small part based on inferences.[75] The plaintiff acknowledges that she faced "significant obstacles."[76] Still, certain claims survived a motion to dismiss and were subject to the entire fairness standard of review. The plaintiff ultimately agreed to release claims that could have potentially recovered a small money damages award for the nominal defendant, if the defendants failed to prove entire fairness at trial.

### C. Balancing the "Give" and the "Get"

In *Investors Bancorp*, the Delaware Supreme Court held that—in most situations—actions taken by directors in setting their own compensation should be reviewed under the entire fairness standard because of the inherent conflicts of interest involved.[77] Since then, the Court of Chancery has had a steady diet of breach of fiduciary duty suits regarding allegedly excessive director compensation. These claims have become fodder for quick settlements and substantial fee requests.

In resolving such suits, the parties generally agree to some form of prospective governance enhancements or therapeutic terms in exchange for a release. This approach is, in my view, often appropriate. To require disgorgement from the

---

[75] *E.g.*, Mem. Op. 25, 34.

[76] Pl.'s Settlement Br. 13-14.

[77] 177 A.3d at 1217 ("Although authorized to do so by statute, when the board fixes its compensation, it is self-interested in the decision because the directors are deciding how much they should reward themselves for board service.").

directors or officers who received the compensation—before those defendants are found to have engaged in wrongdoing—would create an inequitable bar to the voluntary settlement of claims that Delaware law encourages.[78] A derivative action is not about punishment.[79]

The settlement terms presented in post-*Investors Bancorp* director compensation cases vary wildly. In some cases, the parties agreed to meaningful improvements like fixed caps on compensation or quantifiably lower director compensation more in line with the companies' peers.[80] In others, the settlement

---

[78] *See Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964); *see also In re Salesforce.com, Inc. Deriv. Litig.*, C.A. No. 2018-0922-AGB, at 57 (Del. Ch. Dec. 17, 2019) (TRANSCRIPT) ("I disagree with the objector's criticism of the settlement for not obtaining disgorgement from the current directors. Prospective benefits can provide consideration for a derivative settlement, and indeed this court has approved such arrangements many times."); *J & S Eppers Revocable Tr. v. De Backer*, C.A. No. 2021-0084-PAF, at 25-26 (Del. Ch. Jan. 21, 2022) (TRANSCRIPT) ("Although the settlement does not involve a cash payment to the company or disgorgement from these director defendants, the benefit of capping the outside directors' compensation based on a percentage of peers is a quantifiable and meaningful benefit.").

[79] *See Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978) ("Traditionally and historically, the Court of Chancery as the Equity Court is a court of conscience and will permit only what is just and right with no element of vengeance and therefore will not enforce penalties or forfeitures.").

[80] *E.g.*, *In re Salesforce.com*, C.A. No. 2018-0922-AGB, at 55-56, 61 (overruling an objection and approving a settlement of claims challenging non-employee director compensation where the parties agreed to a "meaningful 'get'" of capping average director compensation at the 75th percentile of the company's peers, which reduced the average annual compensation by approximately $200,000 per director); *Solak v. Starr*, C.A. No. 2020-0674-KSJM, at 44-46 (Del. Ch. Oct. 11, 2022) (TRANSCRIPT) (approving a settlement of claims regarding non-employee director compensation where the settlement consideration included backstop "caps" for initial and annual equity grants and dollar-

consideration was modest and approval was granted because the released claims

were of correspondingly limited value.[81]  A few proposed settlements of such claims

have been rejected.[82]

---

based caps on cash compensation, provided "meaningful limits on director compensation," and required the company to seek approval of a non-employee director equity compensation plan); *De Backer*, C.A. No. 2021-0084-PAF, at 15, 25-26 (approving a settlement of excessive director compensation claims where the terms included a substantial reduction in the directors' annual pay for a five year period, including that total annual compensation could not exceed the mean per-director compensation awarded by the 60th percentile of the company's peer group, with an estimated present value of $6.8 million); *Solak v. Barrett*, 2017-0362-JRS, at 19-20 (Del. Ch. May 30, 2018) (TRANSCRIPT) (approving a settlement of compensation-related claims where the company agreed to set compensation at a specific amount with specific limitations and a binding stockholder vote would be taken on the compensation plan); *Pascal v. Czerwinski*, C.A. No. 2020-0320-SG, at 19-20 (Del. Ch. Feb. 7, 2022) (TRANSCRIPT) (approving a settlement of director and officer compensation claims where the settlement contemplated three separate ratification votes, which the court viewed as "an ideal settlement under the circumstances" because it gave stockholders the opportunity to decide whether the compensation was fair); *Alvarado v. Lynch*, C.A. No. 2020-0237-LWW, at 23-24, 27-29 (Del. Ch. June 4, 2021) (TRANSCRIPT) (approving a settlement of non-employee director compensation claims where the company agreed to "meaningful benefits," including to modify its compensation policy to provide that the average total compensation will not exceed the 75th percentile of its agreed-upon peer group, and that the peer group will be approved by its compensation committee with the aid of a compensation consultant); *see also Solak v. Sato*, C.A. No. 2020-0775-JTL, at 42-44 (Del. Ch. Apr. 16, 2021) (TRANSCRIPT) (approving a settlement of seemingly viable excessive compensation claims where the settlement terms were the same "relatively common package of settlement measures," which had "some value" but not "overwhelming value," and a peer group limitation was the "most meaningful" benefit achieved).

[81] *E.g.*, *Solak v. Huff*, C.A. No. 2022-0400-LWW, at 30 (Del. Ch. Jan. 11, 2023) (TRANSCRIPT) (approving a settlement of claims concerning non-employee director compensation where the plaintiff obtained "mild" benefits in exchange for "the release of a claim that isn't particularly strong" and the "give and the get [were] roughly even").

[82] *See Shumacher v. Loscalzo*, C.A. No. 2022-0059-LWW, at 54-55, 61 (Del. Ch. Sept. 21, 2022) (TRANSCRIPT) (rejecting an initial settlement where an objector who filed a separate suit desired to pursue claims and the proposed release was overbroad (citing

This case presents a more extreme scenario. It did not settle shortly after it was filed. Instead, certain claims survived a motion to dismiss—including a claim suggesting that a controller had forced the Compensation Committee's hand to award him a windfall.[83] The governance enhancements serving as settlement consideration do little to address this issue. Nor do they alleviate the inherent conflicts in self-compensation that the court's Memorandum Opinion highlighted. The settlement does not (for example) require the Board to adopt meaningful caps on director compensation or mandate stockholder approval of specific compensation awards or a self-executing formula.[84] In fact, it does nothing of consequence.[85]

---

*Griffith v. Stein*, 283 A.3d 1124 (Del. 2022)); *Shumacher v. Dukes*, C.A. No. 2020-1049-PAF, at 42-43 (Del. Ch. Nov. 17, 2022) (TRANSCRIPT) (declining to approve a settlement of excessive compensation claims where the court was "not persuaded that the get is worth the give").

[83] *See supra* note 25 and accompanying text.

[84] *See Investors Bancorp*, 177 A.3d at 1218, 1222 (explaining that stockholder approval of director compensation may allow for the application of business judgment review if the stockholders approve specific awards or a self-executing compensation formula (citing *Kerbs v. Cal. E. Airways, Inc.*, 90 A.2d 652 (Del. 1952); *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57 (Del. 1952))).

[85] *Compare Howland v. Kumar*, 2018-0804-KSJM, at 25-27 (Del. Ch. Oct. 1, 2019) (TRANSCRIPT) (approving a settlement filed after the court denied a motion to dismiss that "provide[d] for 15 internal corporate governance reforms" including "special parameters within which the compensation committee must operate when discussing the CEO's compensation," a "say-on-pay vote," and "a two-year moratorium on repricing stock options," as well as requiring the compensation committee "to adopt resolutions fixing the exercise price for all unexercised stock options that were repriced in 2017" and the repayment of funds by certain defendants).

If the Stock-Based Compensation Changes and the Fixed Award Date Changes were part of the settlement, I might have found that the settlement fell within a range of fairness.[86] But they are not. The plaintiff could have opted to dismiss her suit and seek a mootness fee. But she did not. That leaves a proposed settlement that is both insufficient and incongruent.

I do not relish rejecting a settlement and I recognize the difficulties parties face in resolving these actions. I am, however, charged with acting as a fiduciary for the nominal defendant in this circumstance.[87] The slight governance enhancements that form the "get" are inadequate consideration in view of the "give" of the release of claims.[88]

The plaintiff's counsel insist that if the court concludes the settlement is inadequate, they are eager to push ahead with the litigation. They are welcome to

---

[86] During the settlement hearing, Vice Chancellor Glasscock observed that the Fixed Award Date Changes "may have some value." Hr'g Tr. 30. Counsel did not, however, emphasize that the Fixed Award Date Changes had long since been implemented—as my review of the Stipulation and the Company's proxy statement indicates. *See supra* note 63. I do not believe that this was untoward; it was a misunderstanding. In any event, the only aspect of the Fixed Award Date Change that I read as perhaps not being implemented pre-settlement is that any "future change" to the date for awarding outside director stock-based compensation will be "disclosed to stockholders." Stip. Ex. A at 5. It is not clear to me, though, whether this adds anything to the Company's current disclosure obligations.

[87] *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 289 (Del. 2002) ("Any decision of the Court of Chancery regarding the fairness of a proposed settlement is within the discretion of that court and requires an application of its own business judgment.").

[88] *See Trulia*, 129 A.3d at 907.

do so.  Given the burden and expense that an entire fairness trial would impose on the Company and that some governance enhancements were admittedly undertaken in response to this litigation, I urge the plaintiff to first consider whether dismissing her claims is in the best interest of the nominal defendant she purports to represent. Continued litigation may ultimately prove detrimental to all parties.  Barring that, I encourage the parties to confer about an amended settlement with meaningful benefits for the Company.

## III.   CONCLUSION

For the foregoing reasons, I decline to approve the settlement as presented. The plaintiff may dismiss her claims and, if she chooses, seek a mootness fee for the benefits already achieved.  Otherwise, the case should proceed.

To the extent necessary for this decision to take effect, IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*
Lori W. Will
Vice Chancellor

cc:     All counsel of record (by File & Serve*Xpress*)